490 A.2d 438

**COMMONWEALTH of Pennsylvania**

v.

**Victor HASSINE, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 11, 1983.

Filed Feb. 8, 1985.

Reargument Denied April 18, 1985.

322

324

Thomas E. Mellon, Philadelphia, for appellant.

Stephen B. Harris, Assistant District Attorney, Warrington, for Commonwealth, appellee.

Before SPAETH, President Judge, and MONTEMURO and POPOVICH, JJ.

MONTEMURO, Judge:

Following a jury trial, appellant, Victor Hassine and his co-defendant, George Gregory Orlowski, were found guilty of first degree murder,[1] several attempted murders,[2] and multiple counts of criminal conspiracy[3] and criminal solicitation.[4] A life sentence was returned by the jury on the first degree murder conviction. After post-verdict motions for a new trial and arrest of judgment were denied, appellant was sentenced to life imprisonment and various consecutive terms of imprisonment. Appellant appeals from this judgment of sentence. We affirm.

Appellant alleges a plethora of alleged points of error. In an effort to provide some order to our review of this particularly lengthy appeal, we shall address each assignment of error *seriatim*. The issues presented by appellant are as follows:

(1) the lower court erred in refusing to grant appellant's motion to sever;

(2) the lower court erred in denying appellant's trial counsel's motion to withdraw;

(3) the lower court erred as a matter of law and abused its discretion in allowing the prosecution to question and comment upon appellant's pre-arrest and post-arrest silence, which conduct amounted to prosecutorial misconduct;

1. 18 Pa.C.S. § 2502.
2. 18 Pa.C.S. § 901.
3. 18 Pa.C.S. § 903.
4. 18 Pa.C.S. § 902.

(4) the lower court erred in failing to direct the court reporter to record closing arguments, which arguments were highly prejudicial and amounted to prosecutorial misconduct;

(5) the lower court erred in its charge to the jury;

(6) evidence presented at trial, which had been intercepted by a consensual wiretap, was illegally obtained, as the statute permitting such a wiretap is unconstitutional;

(7) the evidence was insufficient to sustain the first degree murder conviction;

(8) the lower court erred in refusing to dismiss various counts of conspiracy;

(9) the lower court erred in refusing appellant's application for a Bill of Particulars;

(10) the lower court erred in denying appellant's motion to compel a psychiatric examination of a key prosecution witness;

(11) there was prosecutorial misconduct in that the Commonwealth failed to disclose the full scope of a plea bargain agreement between the Commonwealth and a key prosecution witness;

(12) the lower court erred in refusing to permit appellant's new counsel to present newly discovered, exculpatory evidence;

(13) trial counsel was ineffective;

(14) the trial court erred in refusing appellant's request for an *in camera* inspection of the Commonwealth's file; and

(15) the trial court erred in not ordering merged, for sentencing purposes, consecutive sentences and fines relating to inchoate crimes.

While the list of alleged errors is long, we find it short on merit. Indeed, it is worth noting, as an admonishment to the bar, that this court has never decided appeals based upon the number of pages in a party's brief, but rather

upon the merits of each claim. As to the arguments presented, we look to the quality, not the quantity.

The pertinent facts of this case were fully set forth in our opinion in *Commonwealth v. Orlowski*, 332 Pa.Super. 600, 481 A.2d 952 (1984), wherein we affirmed the conviction of appellant's co-defendant, Gregory Orlowski. These facts are as follows:

"This tale begins in the remote passages of [Orlowski's] youth and unfolds to a tragic denouement. [Orlowski] was a young boy when he became apprenticed to Albert Kellet, Sr., proprietor of the Kellet Family Market in Fallsington, Bucks County. He was a butcher's boy doing odd jobs and cleaning the market while being taught the intricacies of the trade. He was trained and nurtured by the senior Kellet to such an extent that he was like a member of the family; almost like a brother to Kellet's natural son, Albert, Jr., also known as 'Skip.' Skip also worked at the family market but growing differences between him and his father caused him to seek employment elsewhere, while [Orlowski] remained.

"Since they were reared as brothers, [Orlowski] and Skip had their 'good and bad times.' It would seem that their situation could be characterized as either fighting or between fights. On several occasions, their fights stemmed from drug deals which had soured.

"In 1975, the senior Kellet sold the store. [Orlowski] went with the new owners 'like a piece of equipment,' and he continued to run the meat department. At some point in the late seventies, [Orlowski] rented the store and operated it himself. He also began operating a small side business— dealing in marijuana and methamphetamine. Coincidentally, Skip Kellet engaged in a similar sideline.

"Enter Victor Hassine, the young scion of a wealthy emigre family which had some real estate holdings in the Fallsington area. Moreover, Hassine was the vessel into which three years of legal education had been poured, and so he was entrusted by the family corporation with the

management of some of its interests including those in the Fallsington area.

"In 1979, Hassine met [Orlowski] and decided to go into business with him. Together they opened a new store in Morrisville, Bucks County, called Greg's Quality Meat Market, which was financed by the Hassine family, overseen by Victor Hassine, and operated by [Orlowski]. For various reasons, the business did not prosper, and soon [Orlowski] began selling marijuana and methamphetamine out of the store to supplement the store's income. He and several employees of the store engaged in the selling. Hassine also began to advise [Orlowski] how to squeeze more profit out of the drug sales.

"In early June of 1980, Skip Kellet purchased some methamphetamine from [Orlowski] for one hundred and fifty ($150.00) dollars. Upon bringing the drugs back to his apartment, Kellet discovered the drugs were of an inferior quality and he became enraged. In order to gain revenge on [Orlowski], he called him and told him the drugs were good and he wanted more. [Orlowski] came to Kellet's apartment (where coincidentally [Orlowski] had lived for several years prior to Kellet's tenancy) and encountered the enraged Kellet brandishing a cudgel. Kellet threatened him with the club; took the drugs, which [Orlowski] had brought with him, and all of [Orlowski's] money (either sixty-four ($64) or one hundred and four ($104) dollars); and threw him out of the apartment.

"A few days later, a meeting was held at the meat market. Present were [Orlowski], Hassine, various employees of the meat market, and one William Eric Decker, an itinerant drug fiend and convicted felon, who had been doing labor work for Hassine. Hassine told Decker, in [Orlowski's] presence, that he wanted Skip Kellet killed, or 'wasted.' Hassine also said that if Kellet's wife, Lois, was there, she 'was to go also, because any witnesses had to go.' [Orlowski] added that Kellet could be killed at Penn Manor Lakes because he always went fishing there. He also asked one of the employees, Billy Hayes, who lived next

door to Kellet, if he could shoot Kellet from Hayes' bedroom window with Hayes' father's gun. Hassine then asked everyone to attempt to procure a gun. [Orlowski] went out and made a phone call, ostensibly to attempt to find a gun, but the party he tried to reach was 'sleeping.'

"Thereafter, Decker accompanied [Orlowski] to the home of one David Evans, a friend of [Orlowski]. Their purpose in going there was to look for a gun. However, Evans' gun, a hunting rifle, was not suited to their purposes so they did not take it. Decker also accompanied Hassine to the apartment of one Ted Camera, a tenant of a Hassine family apartment in Trenton, to ask for a gun; but again they did not obtain one.

"[Orlowski] purchased a .25 caliber automatic handgun from a Tom Easterwood for seventy-five ($75) dollars. Sometime in July, 1980, Hassine gave this weapon to Decker and said, '[h]ere, hit him in the head and leave it there.' The gun was test-fired by Hassine and Decker in the back of the market in the presence of [Orlowski] and was found to have a defective part.

"In late July, 1980, there was a confrontation between Kellet and Hassine in front of one of Hassine's apartments (which was coincidentally across the street from Kellet's apartment). Hassine filed criminal charges of harassment against Kellet. Later a charge of terroristic threats was added when Kellet called the meat market and threatened to burn it down.

"On August 1, 1980, Hassine and Decker drove to Edelman's Gun Shop to obtain a part to repair the gun. They did not get the part, but Hassine purchased a box of shells for the gun, for which he signed the register.

"Returning from Edelman's, they passed Kellet's apartment, and seeing Kellet, Hassine told Decker to shoot him. Decker demurred because it was daylight, a witness was present and because Hassine was there. Hassine promised Decker that he could have one of Hassine's apartments if he killed Kellet.

"On or about August 5, 1980, [Orlowski] and Hassine met with Fred Tuite and Joseph 'Critter' Schwab at [Orlowski's] house. Tuite and Schwab were members of the Breed Motorcycle Gang, and Tuite had just been bailed out of jail by Kerry Conklin, a friend of [Orlowski's] who frequented the market and also worked as a laborer for Hassine. Tuite had been jailed for offenses relating to the possession of a .357 magnum handgun, which he previously had attempted to sell to Hassine. Tuite and Schwab were asked by Hassine how much they wanted to kill Kellet. They answered fifteen hundred ($1,500) dollars. [Orlowski] then asked how much to have Kellet beaten up. They answered two hundred and fifty ($250) dollars. At Hassine's direction, [Orlowski] left the room and returned with an envelope containing the lesser amount. Tuite and Schwab never did the job.

"Thereafter, [Orlowski] told Billy Hayes that Tuite and Schwab were not going to do the job, but rather Eric Decker was designated to kill Kellet. About two and one-half weeks before the shooting, a Paul Koenig, from whom [Orlowski] had tried to obtain an unmarked, unregistered handgun, asked [him] if he still needed a gun. [He] answered 'no' that Victor got one. He also said, 'We're going to do it Victor's way.'

"On the evening of August 22, 1980, Kellet and his wife drove to the 'Dunkin' Donuts' across the street from [Orlowski's] market. Kellet parked the car so that it faced the market. It should be noted that in the period after the drug 'rip-off,' in addition to the above, there was a continuing pattern of cross-harassment between [Orlowski] and Kellet. [Orlowski] saw Kellet, and was worried about his presence. Shortly thereafter, Decker telephoned the market and was told Kellet was there. Decker drove to the market with a friend and after exiting the vehicle, he walked to Kellet's car and sticking his head in the passenger window said, '[a]re you Skipper Kellet?' Kellet answered by exiting his car with a baseball bat in his hand. Decker retreated to his friend's vehicle and then went to the meat market. [Orlow-

ski] unlocked the door and allowed Decker to enter. Decker asked [him] if Hassine was coming. [Orlowski] said 'yes.'

"[Orlowski] and Decker went to [Orlowski's] van which was parked in front of the market and waited for Hassine. Decker said to [Orlowski], '[t]his cat has got to go.' [He] and Decker smoked a marijuana cigarette. Hassine then drove up with his brother, Eli, in a Datsun 280Z. Decker and [Orlowski] left the van and approached Hassine's car. Decker said, 'Tonight's the night—this cat's got to go. We'll use your gun. I want two hundred and fifty dollars.' Hassine said he would come back and pick up Decker.

"While Hassine was gone, Decker asked [Orlowski] for a shirt to cover his tattoos. [He] gave him a long-sleeve tan shirt that was in the market. Hassine returned about fifteen minutes later. He and Decker left and drove to the house of Hassine's parents in Trenton. While Decker waited in the car, Hassine went inside and obtained his father's .380 Llama handgun. They drove back to Fallsington and Hassine dropped Decker off. Hassine gave Decker a New York Yankees batting helmet to cover his hair. Decker walked up the street, but got lost despite the directions which Hassine had given him. After about twenty minutes, he found Kellet's apartment. Before going there, he went to the apartments owned by Hassine across the street and sat for a few minutes. He then walked across the street to Kellet's. Actually, Kellet and his wife occupied a second floor apartment, but on this evening they were in the first floor apartment of George Sofield. Decker entered through the kitchen and proceeded into the living room—the .380 Llama ready to use. There were four people in the living room watching the Friday night fights—Skip Kellet, Lois Kellet, George Sofield and James Puerale.

"As Kellet rose from his chair, Decker fired one shot from the .380 Llama, which struck Kellet in the head, injuring him. Decker turned and fired a shot at Lois Kellet which struck her in the neck and wrist. Decker then shot at Sofield, but missed. Finally, he shot Puerale, an inno-

cent bystander with no connection to the feud between Kellet and appellant. Puerale was killed instantly.

"In the interim, Hassine had gone to [Orlowski's] house. [Orlowski] and Hassine, and a third person, Michael Thompson, got into Thompson's car. Hassine was carrying a piece of metal pipe approximately twelve inches long. Hassine directed Thompson to drive up and down certain streets while Hassine whistled out the window. He directed Thompson to stop in the parking lot across from Kellet's apartment. He then directed Thompson to drive to the parking lot of a school behind Kellet's apartment. They then drove to Dunkin' Donuts, where they remained for four or five minutes, until Hassine said, 'We've been seen.' The men then drove back into Fallsington, and as they were driving long they heard two shots. Hassine stated: 'Oh shit, that's my father's gun. I hope that asshole doesn't get caught.' [Orlowski] said: 'Oh, shit, it happened.' A few minutes later, Hassine had Thompson stop the car and call, 'Eric.' "

*Id.*, 332 Pa.Superior Ct. at 615–616, 481 A.2d at 957–59.

## 1. SEVERANCE

Appellant's first allegation of error on the part of the trial court is that the court abused its discretion by denying appellant's motion to sever. Appellant argues that severance of his and his co-defendant Orlowski's trial was warranted due to (1) the complexity of the evidence, (2) the introduction of evidence admissible against co-defendant Orlowski and not admissible against appellant which was prejudicial to appellant, and, (3) the antagonistic defenses of appellant and his co-defendant.

 In considering these contentions, we note at the outset that our standard for reviewing a lower court's disposition of a severance motion has been definitively set forth in *Commonwealth v. Hamm*, 325 Pa.Super. 401, 473 A.2d 128 (1984):

"[Q]uestions of consolidation or severance of defendants for trial rest in the discretion of the trial judge and his

rulings on such matters will not be disturbed on appeal except for manifest abuse of discretion." *Commonwealth v. Tolassi*, 258 Pa.Super. 194, 199, 392 A.2d 750, 753 (1978), *aff'd*, 489 Pa. 41, 413 A.2d 1003 (1980). See: *Commonwealth v. Middleton*, 320 Pa.Super. 533, 551, 467 A.2d 841, 850 (1983); *Commonwealth v. Johnson*, 291 Pa.Super. 566, 581, 436 A.2d 645, 653 (1981). When the crimes charged arise from the same acts or series of acts and much of the same evidence is necessary or applicable to all defendants, a joint trial is "permissible, if not advisable." *Commonwealth v. Jackson*, 451 Pa. 462, 464, 303 A.2d 924, 925 (1973). See: *Commonwealth v. Kloiber*, 378 Pa. 412, 415, 106 A.2d 820, 823, *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954); *Commonwealth v. Fields*, 317 Pa.Super. 387, 398–399, 464 A.2d 375, 381 (1983); *Commonwealth v. Norman*, 272 Pa.Super. 300, 306, 415 A.2d 898, 901 (1979); *Commonwealth v. Weitkamp*, 255 Pa.Super. 305, 321, 386 A.2d 1014, 1022 (1978). Especially where a conspiracy to commit crime is alleged, the defendants should be tried together, "unless it can be shown that one or more of the defendants will be actually prejudiced by doing so." *Commonwealth v. Johnson, supra*, 291 Pa.Super. at 582, 436 A.2d at 653. See: *Commonwealth v. Katsafanas*, 318 Pa.Super. 143, 156–157, 464 A.2d 1270, 1277–1278 (1983); *Commonwealth v. Tolassi, supra*, 258 Pa.Super. at 200, 392 A.2d at 753.

*Id.*, 325 Pa.Superior Ct. at 409–410, 473 A.2d at 132–33. *See also* 18 Pa.C.S. § 903(d)(1)(i), (ii); Pa.R.Crim.P. 1127. As we also noted in *Commonwealth v. Orlowski, supra*, appellant and his co-defendant were charged with a variety of criminal conspiracies "wherein the Commonwealth alleged agreement ... to effect the killing of Skip Kellet." *Id.*, 332 Pa.Super. at 624, 481 A.2d at 964.

■ Appellant first argues that the evidence presented was so "complex" as to make the trial "un-necessarily cumbersome with regard to deciphering the facts and applying the law." Appellant's Brief at 34. This "complexity"

arose from what appellant perceives as being different conspiracies alleged by the Commonwealth; i.e., one involving appellant and Orlowski, another involving appellant and Decker, etc. We find no merit in this argument. Here both co-defendants were charged with the same offenses arising out of the same criminal activity. We agree with the Commonwealth and the trial court that "[w]hat the [appellant] argue[s] was a series of different conspiracies is more correctly viewed as a pattern of events which unfolded during the course of the carrying out of that one underlying conspiracy to kill." Lower Court Opinion at 8. *See also Commonwealth v. Tolassi*, 489 Pa. 41, 49–50, 413 A.2d 1003, 1007 (1980). As such, we do not deem the instant case to have been too "complex" or "confusing" to warrant severance. *See Commonwealth v. Orlowski, supra*, 332 Pa.Super. at 626, 481 A.2d at 964–65.

■ Appellant further argues severance was required because evidence was introduced which, while admissible against Orlowski, was inadmissible against appellant. According to appellant, a "classic example" of such testimony was the testimony regarding statements made by Orlowski to police officers after the shooting incident.[5] Despite limiting instructions by the trial court, appellant contends that this type of testimony amounted to a co-defendant's admission which inculpates appellant in violation of the Sixth Amendment right to confrontation as set forth by the United States Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, this testimony actually *exculpates* appellant, so that the *Bruton* decision, which dealt with the use as evidence of a co-defendant's *inculpatory confession*, is inapposite. Indeed, the very testimony of which appellant complains, was

5. The testimony was that of police officer George Mitchell who relayed, with the help of a report prepared after the interview, various statements made by Orlowski as to Orlowski's and appellant's whereabouts the night of the shooting; i.e., that appellant arrived at Orlowski's apartment at about nine o'clock and discussed the meat market until approximately eleven o'clock. N.T. June 5, 1981, at 941–50.

corroborated—by appellant himself. This argument, therefore, is devoid of merit.

■ Other testimony is asserted to have been inadmissible against appellant solely because it was elicited by co-defendant's counsel through the use, on cross-examination, of leading questions. Appellant claims these questions would not have been proper if posed by the Commonwealth on direct examination, thereby making the testimony somehow inadmissible. It is clear, however, that the Commonwealth could have elicited the same testimony *without* the use of leading questions, and indeed did just that quite effectively. Hence we reject appellant's argument.

■ The third leg of appellant's severance argument is his assertion of antagonistic defenses. For the reasons set forth in *Commonwealth v. Orlowski, supra,* 332 Pa.Super. at 626, 481 A.2d at 965, we find this argument to be unsupported by the record.

## 2. WITHDRAWAL OF COUNSEL.

■ Appellant next argues the lower court erred as a matter of law and abused its discretion by denying appellant's motion for a mistrial and refusing the request of trial counsel, Thomas Rutter, to withdraw as counsel.

At trial, the Commonwealth called as a witness Joseph Schwab, a/k/a Critter, a onetime member of the Breed Motorcycle Club. During cross-examination, Rutter asked Critter if he had ever met with Ronald Christopher, who was identified by Rutter as "an investigator that works for me." N.T. June 3, 1981, at 656. Critter answered, "Yeah", *id.* Shortly thereafter, on redirect examination, the district attorney elicited from Critter testimony to the effect that Critter had proposed to Christopher a deal whereby Critter, who was scheduled to visit the district attorney's office, would somehow mimeograph the district attorney's file on appellant's case and deliver a copy to Christopher for $350. Critter testified that Christopher not only agreed to this

scheme, but also gave him $350 for what in actuality was blank paper. N.T. June 3, 1981, at 657–60.

The *only* objection made by Rutter during this testimony was to the district attorney's question which asked: "You could work for Mr. Christopher and Mr. Rutter and he would pay you?" *Id.* at 657. Rutter objected, explaining: "He never said he would work for me—and he wouldn't." *Id.* The district attorney then rephrased the question, excluding any reference to Rutter.[6] The next day, before trial resumed, Rutter made oral motions for a mistrial and to withdraw as counsel; both motions were denied.

On appeal, appellant argues that the Commonwealth's line of questioning represented calculated conduct designed to elicit irrelevant and highly prejudicial evidence which implicated defense counsel in illegal and unethical acts. As such, it amounted to prosecutorial misconduct which should have induced a mistrial. In addition, he contends the only way to have "clearly discredited" this prejudicial testimony was to allow Rutter to testify, which would have required his withdrawal as trial counsel. In short, without Rutter's testimony, his argument goes, there was no cure but to have granted appellant's motion for a mistrial.

We accept none of appellant's contentions. The only question objected to by Rutter was withdrawn, and no further mention was made by the district attorney or any other witness to a connection between Rutter and Critter. In addition, Christopher, the only person alleged to have been involved in Critter's scenario, testified that no money or papers were exchanged, that he was an independent private investigator, had never been an employee of Rutter's and that when he informed Rutter's associate of the

---

**6.** Further testimony clarified Critter's perception of Christopher's role in the proposed scheme.

Q. [By the District Attorney]
 And Mr. Christopher identified himself as being an investigator for whom?

 \* \* \* \* \* \*

THE COURT: For which defendant?
THE WITNESS: Hassine, I believe—yeah, Hassine.
N.T. June 3, 1981, at 658.

request, the associate out-right rejected any such dealing, telling him it was illegal. N.T. June 9, 1981, at 1571–81.

■ The testimony presented clearly illustrates there was no need for Rutter to testify. In arguing for Rutter's withdrawal, appellant cites Disciplinary Rule (DR) 5–102 of Canon V of the Pennsylvania Code of Professional Responsibility. However, DR 5–102 requires withdrawal of counsel when "a lawyer learns or it is obvious that he ... *ought* to be called as a witness on behalf of his client." (emphasis added).[7] That is not the case here. Indeed, it is not clear what Rutter, who by all accounts was *not* a party to the discussions mentioned in Critter's testimony, would have been able to testify about. "Unquestionably, the participation of counsel as a witness in the trial is to be discouraged." *Commonwealth v. Floyd*, 494 Pa. 537, 546, 431 A.2d 984, 989 (1981). While the prospect of a trial counsel's testimony has been held to warrant a mistrial, it has only been so when the trial attorney's testimony would "go to the heart of the case" and the attorney was the only *party* to the conversation, other than his client, who could rebut the witness. *Commonwealth v. Beaver*, 317 Pa.Super. 88, 104–107, 463 A.2d 1097, 1106–07 (1983). Hence, we find appellant's arguments regarding his petition to withdraw as counsel and his motion for a mistrial lacking in merit.

3. PRE-ARREST AND POST-ARREST SILENCE.

■ As another assignment of error, appellant argues the lower court abused its discretion when it permitted the district attorney and co-defendant's counsel to cross-examine appellant about his pre-arrest and post-arrest silence.[8]

---

7. Pennsylvania Code of Professional Responsibility, Canon V, Ethical Consideration (EC) 5–10 states:
 It is not objectionable for a lawyer who is a *potential* witness to be an advocate if it is *unlikely that he will be called* as a witness because his testimony would be merely cumulative. (emphasis added).

8. Appellant also claims error when the trial court allowed the district attorney to refer to appellant's exercise, post-arrest, of his constitutional right to counsel. This occurred, he claims, when the district

For good measure, appellant also claims the district attorney's line of questioning amounts to prosecutorial misconduct.

 As to appellant's pre-arrest silence, we note preliminarily that appellant testified at trial in his own defense. Briefly put, his direct testimony attempted to explain his actions and whereabouts on the night of the shooting as being a desperate and eventually unsuccessful attempt to stop a crazy-eyed Decker from killing Skip Kellet. This was offered to explain, among other things, his having been in the immediate vicinity of the shooting around the time it occurred, as well as his fear of Decker getting caught with his father's gun. He testified that his realization of what was about to happen that night came after Orlowski told him of Decker's confrontation earlier that day with Kellet, and Decker's ranting and raving about killing Kellet. According to appellant, all of a sudden "it summed up." N.T. June 9, 1981, at 1412.

On cross-examination, the district attorney asked if appellant had, either that night or the next morning, gone to the police and told them what he knew about the shooting. This was objected to by appellant's trial counsel, but the objection was overruled. On appeal, appellant now argues this cross-examination represents a violation of "Pennsylvania's Constitution, and the laws of Pennsylvania." Appellant's Brief at 61.

It is understandable that appellant cannot be more specific. He acknowledges, as he must, that the United States Supreme Court has clearly held that the impeachment use of pre-arrest silence, silence which occurs prior to governmental action inducing an individual to remain silent, does not violate the Fifth or Fourteenth Amendments to the United States Constitution. *Jenkins v. Anderson,* 447 U.S.

attorney asked him about the visits his brother, Eli, an attorney, made to the prison where appellant was incarcerated. No objection was made to this questioning, so we need not address it. We also note, however, that trial counsel, at post-verdict hearing, testified that Eli Hassine did not have "any legal input into what we were doing." N.T. May 7, 1982, at 290.

231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). The only case law appellant cites, *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982) dealt with a prosecutor's reference to a defendant's *post*-arrest silence.[9] Hence *Turner* is not controlling as to appellant's *pre*-trial silence. There is no dispute here that the silence referred to occurred before his arrest; indeed, appellant admits as much.

As to appellant's post-arrest silence, the objectionable line of questioning elicited from appellant answers to questions about his silence during the months leading up to trial. Essentially, appellant was asked why he had not come forward with his version of the shooting prior to trial. However, on direct examination, appellant testified that he made at least two offers to cooperate, through his attorney, with the police in their investigation. These offers were ignored, according to appellant. N.T. June 9, 1981, at 1480–81.

 Testimony regarding a defendant's post-arrest silence is generally inadmissible. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, "such testimony could be elicited to refute contrary statements volunteered by the defendant to demonstrate his cooperation at the time of questioning." *Commonwealth v. Bey*, 294 Pa.Super. 229, 234, 439 A.2d 1175, 1177 (1982). We believe this occurred here. The district attorney elicited testimony designed to rebut appellant's claim that he cooperated with the police, not to suggest appellant's guilt to the jury. Hence we find no error.

4. RECORDATION OF ARGUMENTS.

 Appellant next finds error in the lower court's failure to direct the recordation of the district attorney's clos-

**9.** Although the brief, factual outline in *Turner* does not specifically state that the objectionable reference was to silence at the time of arrest or custody, or immediately thereafter, the court does refer to the effect on the jury of "the reference to appellant's post-arrest silence." *Commonwealth v. Turner, Id.*, 499 Pa. at 585, 454 A.2d at 540. *See also* Dissenting Opinion by Nix, J., *Id.*, 499 Pa. at 586, 454 A.2d at 541.

ing argument, which, he alleges, contained improper and prejudicial remarks. Alternatively, appellant contends his trial counsel was ineffective because of his failure to object to the statements and to have them recorded. The objectional statements allegedly referred to appellant's brother, Eli, as a member of the defense team who might face charges himself.[10]

At trial, no objections were raised to the prosecutor's remarks, nor was any request made by appellant's trial counsel to record the summation.[11] "The lack of an objection to alleged prejudicial remarks made during a summation which is not recorded renders the issue waived and not properly preserved for appellate review on the merits." *Commonwealth v. Brown*, 496 Pa. 86, 88–89, 436 A.2d 165, 166 (1981). Hence the issue of error regarding the failure to record the summation is not before this court.

As to the ineffectiveness claim, counsel will not be deemed ineffective if his conduct had a reasonable basis designed to advance the client's interest. *See Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967) and its ubiquitous progeny. It is appellant's position that his trial counsel was ineffective when he failed to object to the allegedly prejudicial remarks and by failing to request recordation of these remarks.

A post-verdict evidentiary hearing was held at which testimony was admitted regarding the prosecutor's closing statements. Among the witnesses produced by appellant were two journalists from local newspapers who were present during the summation and who subsequently wrote articles which mentioned the district attorney's references

10. Appellant also objects to comments about his pre-arrest and post-arrest silence and acquisition of counsel. For reasons above, we deemed this testimony to have been properly admitted and, therefore, there was no error in the district attorney's mentioning them.

11. At the time of the trial there was no requirement in the Pennsylvania Rules of Criminal Procedure that opening and closing statements by counsel be recorded and transcribed. *See* Pa.R.Crim.P. 9030 (effective July 1, 1981).

to Eli Hassine during his summation; i.e., that Eli might also be a co-conspirator.

"In order to assure that a defendant's right to appeal will not be an empty, illusory right, we require that he or she be furnished a full transcript or other equivalent picture of the trial proceedings." *Commonwealth v. Shields*, 477 Pa. 105, 108, 383 A.2d 844, 846 (1978). However, a "[s]tenographic recordation of the prosecution's summation is not a requisite of due process *as long as an equivalent picture of what transpired below is apparent.*" *Commonwealth v. Olivencia*, 265 Pa.Super. 439, 452, 402 A.2d 519, 525 (1979) (emphasis added). Here an "equivalent picture" exists by virtue of the notes of testimony from the evidentiary hearing. We do not, therefore, find trial counsel to have been ineffective for failing to request recordation of the summation.

Appellant's contention that trial counsel rendered ineffective assistance by failing to object to the district attorney's remarks about the probable guilt of Eli Hassine also lacks merit. "[E]ven where the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required." *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975). Likewise, the failure to object to such language is "not necessarily" ineffective assistance of counsel. Rather, to rise, or perhaps one should say to sink, to this level, the prosecutor's "language must be such that its 'unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility *toward the defendant,* so that they could not weigh the evidence and render a true verdict.'" *Id., quoting, Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968) (emphasis added). In addition, the general rule is that a prosecutor should limit his or her summation to the facts in evidence and all reasonable inferences derived therefrom. *Commonwealth v. Benson*, 280 Pa.Super. 20, 34, 421 A.2d 383, 390 (1980); *see also, Commonwealth v. Gilman*, 470 Pa. 179, 368 A.2d 253

(1977); ABA Standards for Criminal Justice (The Prosecution Function), Ch. 3, § 5.8(a) (1982 Supplement).

In the instant case, Eli Hassine's own testimony at trial conceded the possibility of his guilty involvement.[12] Hence, any reference by the district attorney was to evidence admitted at trial. At any rate, the lower court found appellant's testimony at the evidentiary hearing to have been "equivocal at best" as to what was actually said during the summation, Lower Court Opinion at 14, and chose instead to believe the testimony of the prosecuting attorney. As such, the lower court found the reference regarding Eli Hassine's testimony and directed to someone other than the defendant, not to have been so prejudicial or improper as to provide a basis for appellant's ineffectiveness claim. *Id.* at 40–42. Although we find the prosecutor's remarks to have been unfortunate, we agree that they would not have justified awarding a new trial and therefore reject appellant's ineffectiveness claim. *See Commonwealth v. Olivencia, supra,* 265 Pa.Super. at 44, 402 A.2d at 524.

## 5. JURY CHARGE.

Appellant would have us find error in the trial judge's instructions to the jury on six issues, *viz.:* (1) reasonable doubt; (2) the court's reference to a "particular juror"; (3) second degree murder; (4) specific intent and

---

12. The following exchange occurred at trial between the district attorney and witness, Eli Hassine:

Q. Well, Mr. Hassine, if the jury or if the Commonwealth were to believe that you were present at the time that Eric Decker told your brother "This cat's got to go"—"We're going to use your gun"—"Tonight's the night": If you assisted your brother in getting that .380 that evening, you would have a possible criminal involvement in this case rising to the level of your brother, would you agree?

MR. RUTTER: Objection.

THE COURT: Overruled.

BY MR. GOLDMAN:

Q. Would you agree?

A. If I assisted my brother in getting that gun and participating in the murder, I would be involved in that crime, that's correct.

N.T. June 10, 1981, at 1667–68.

accomplice liability; (5) the court's failure to charge involuntary manslaughter; and (6) premeditation and malice. Isolated portions of each of these charges are objected to; however, we note at the outset of our review that "[i]t is the general effect of [each] charge that controls." *Commonwealth v. Woodward*, 483 Pa. 1, 4, 394 A.2d 508, 511 (1978). Each alleged error shall be addressed in turn.

The reasonable doubt issue was explained by the trial judge to the jury as follows:

It is, therefore, obvious that you must understand what we mean by the term "reasonable doubt." By the term "reasonable doubt," we mean a doubt arising from the evidence, which doubt is substantial, well-founded in reason and common sense and is an honest doubt, being one that springs from a fair, thoughtful and careful consideration of the evidence in the case. A reasonable doubt is not merely a passing fancy that might come into your minds, or a doubt conjured up for the purpose of avoiding an unpleasant duty. It should be such a doubt as would cause a reasonable man in the conduct of his important affairs to *stop*, restrain himself and seriously consider as to whether or not he should do a certain thing before finally acting. It is something different and more serious than a possible doubt, for in the very nature of human affairs a possible doubt exists in all things.

N.T. June 11, 1981, at 1699 (emphasis added).

Appellant's sole argument is that the inclusion of the word "stop" represents "controlling language" which was found to be error by this court. *Commonwealth v. Tachoir*, 166 Pa.Super. 239, 70 A.2d 474 (1950) (error to charge, in effect, that it is such a doubt as would *control* (prevent) a decision). We find no merit in this argument, and consider this instruction proper in light of the supreme court's recommended standard jury charge. *Commonwealth v. Donough*, 377 Pa. 46, 103 A.2d 694 (1954); *see also Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974); *Commonwealth v. Boone*, 287 Pa.Super. 1, 429 A.2d 689 (1981) ("A doubt that will restrain a reasonable person

from acting" would be a proper instruction); Pennsylvania Suggested Standard Jury Instructions (Criminal) 7.01.

 Concerning appellant's objection to the court's reference to a "particular juror," the trial judge, in the course of his jury instruction, used by way of one example, a hypothetical scenario in which he specifically referred to two members of the jury. This, the appellant claims, inappropriately placed a juror in the position of a victim and thereby deterred the jury from an objective consideration of the issues. To support this argument, appellant cites *Commonwealth v. Cherry*, 474 Pa. 295, 378 A.2d 800 (1977) (impermissible for prosecutor, during summation, to ask jurors to imagine themselves as victims who subsequently must testify at trial). Appellant's argument is groundless, as here the trial judge posited a hypothetical situation which clearly was used to clarify a difficult jury instruction. It is obvious that the reference was not aimed at improperly invoking the sympathy of the jurors for the victims.

 Appellant next argues that the charge to the jury on second degree murder was defective. Our review of the instructions [13] uncovers no defect. The trial judge properly

---

**13.** The charge given was as follows:

Turning to second degree murder, you must find these elements to have been established beyond a reasonable doubt: First, that an accomplice of the defendant or defendants caused the death of James Puerale. That is to say, again you must find the death of James Puerale would not have occurred but for the act of Decker; secondly, that the person intentionally, knowingly, recklessly or negligently caused such a death; and finally, that the killing was committed while the accomplice of the defendant was engaged in a burglary.

I am sure you all know what we mean in the law by burglary. Basically it is the entry into an occupied structure, and here it would be the apartment of Mr. Sofield, according to the Commonwealth's version in this case, and the entry was made with the intent at the time to enter to commit a crime therein. That is to say, it was the conscious object or purpose of the person entering to commit such a crime. In this case the Commonwealth, through the testimony of Decker, contends that he entered this occupied structure, the apartment of Sofield, with the intent and purpose to kill, to murder Albert Kellett [sic]. You must also find that the defendant at the time that he entered did not have permission or was licensed to do so and that the apartment was occupied.

directed that appellant could be found guilty of second degree murder if he was found to have been an accomplice of Decker and if Decker was found to have committed the murder of Puerale while committing the burglary of entering the apartment intending to kill Kellet. This was a proper statement of the law, based on an "accomplice theory", to use the lower court's term, of second degree murder. *See Commonwealth v. Yuknavich,* 448 Pa. 502, 295 A.2d 290 (1972); 18 Pa.C.S. § 2502(b).

 Appellant next attacks the trial court's charge to the jury on his liability as an accomplice. As with his argument on the sufficiency of the evidence, appellant contends more specifically that "specific intent" was not adequately defined and that, indeed, no evidence existed of appellant's shared intent to kill the victim. We reject this contention, and, as to the issue of shared specific intent, direct the reader's attention to our discussion in section 7 of this opinion. Having reviewed the allegedly erroneous instructions in their entirety, as we must, *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), we find them to have been adequate.[14]

N.T. June 11, 1981, at 1708–09.

**14.** Appellant condemns the following jury charge as a gross misstatement of the law:

> *Along these lines we have been told by the Commonwealth's evidence, if, in fact, that evidence is accepted by you, that Hassine and Orlowski did not promote, did not facilitate, did not aid, et cetera, the killing of Puerale,* but, according to the Commonwealth's theory, which each of the defendants denies, the target, or the person sought to be killed, was this Albert "Skip" Kellett [sic].

N.T. June 11, 1981, at 1701–02 (appellant's emphasis). However, whatever prejudice this may have caused or whatever confusion may have arisen in the minds of the jurors, and we believe there was neither prejudice nor confusion, the court later clarified the charge, *viz.*:

> The Commonwealth contends, however, that the killing of Puerale was a natural consequence of the promotion of the crime of killing Kellett [sic] because it would follow that even though Kellett [sic] was not killed, he was shot and left for dead and that the actual perpetrator, Decker, would shoot and kill eyewitnesses, and that this was something envisioned by the alleged accomplices when they promoted and facilitated Decker to do this act. In fact, if the Commonwealth's evidence is to be believed in full, it is my recollec-

 Appellant's next charge of error is without question his most frivolous. Irrespective of the evidence, he argues that a jury charge on involuntary manslaughter is always available upon request of the defendant, calling the clear holding of the Pennsylvania Supreme Court in *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399 (1980), "erroneous". In *White*, the court stated unequivocally "an involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case *and the trial evidence reasonably would support such a verdict." Id.*, 490 Pa. at 185, 415 A.2d at 402 (emphasis added). The evidence in this case certainly supports the trial court's decision to reject appellant's request for an involuntary manslaughter instruction.

 The last so-called "improper" charge, according to appellant, is the lower court's definition of premeditation and malice, as they relate to first degree murder. This argument is also without merit. The jury instruction as to these points is almost indistinguishable from Pennsylvania Standard Jury Instruction (Criminal) 15.2501 A(1) and squarely comports with the dictates of *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976). We find that this instruction was entirely correct.

## 6. THE WIRETAP ACT.

 In his omnibus pre-trial motion, by objection during trial, in his post-verdict motions for a new trial and arrest of judgment, and now on appeal, appellant has argued that evidence obtained from a wiretap of intercepted telephone conversations should have been suppressed. His argu-

tion that there was some discussion that not only was Decker to kill Kellett [sic], but that "all eyewitnesses were to go" or words to that effect, or words that are for you to remember. This, however, is an additional question for you to resolve and conclude by the degree of proof we have previously mentioned before the Commonwealth is entitled to a conviction on the murder phase of this case .... *Id.* at 1703. This was prefaced with the statement that a defendant can only be liable on an accomplice theory "for the fair import of the concerted purpose that the defendant or defendants wish to accomplish." *Id.* at 1702.

ments challenge not just the investigatory conduct vis-a-vis the Pennsylvania Wiretapping and Electronic Surveillance Control Act of 1978 (the Act),[15] but also the constitutionality of the Act itself.[16]

The uncontradicted testimony at trial showed that the Bucks County District Attorney's Office attached a "line drop"[17] wiretap on the telephones located in Michael and Colleen Thompson's apartment. This tap was installed, with both the Thompsons' voluntarily giving blanket consent, on November 21, 1980, and remained on the telephones until November 24, 1980. The tap was executed after Michael Thompson, who had been with appellant on the night of the shooting, first went to the police station on November 19, 1980, to tell his version of the events.

Among the conversations intercepted were ones between Michael Thompson and appellant. Those conversations, which were played in front of the jury at trial, contained potentially incriminating evidence of appellant's efforts to conceal the crime, as well as what might have been considered an admission of his involvement in the shooting.[18]

15. Act of October 4, 1978, P.L. 831, No. 164, § 2, 18 Pa.C.S. § 5701 *et seq.*

16. Appellant's failure to notify the Attorney General pursuant to Pa.R.A.P. 521(a) would normally constitute a waiver of his constitutional challenge. *Commonwealth v. Duncan,* 279 Pa.Super. 395, 421 A.2d 257 (1980). However, this court, in the interest of judicial economy and because the plain language of Rule 521(a) exempts the challenging party from this obligation where the Commonwealth is a party, has adopted the policy of *addressing* the merits of these constitutional challenges. *Commonwealth v. Bottchenbaugh,* 306 Pa.Super. 406, 452 A.2d 789 (1982); *Commonwealth v. Koch,* 288 Pa.Super. 290, 431 A.2d 1052 (1981).

17. A "line drop" wiretap can be inserted into the telephone plug and is connected to a tape recorder. It is activated whenever the telephone is taken off the hook.

18. The primary purpose of appellant's calls appeared to have been to find out what questions the police asked Thompson and his responses to those questions; i.e., whether Thompson had implicated appellant in the shooting through his version of what happened the night of August 22, 1980. In addition, appellant discussed the possibility of buying the Kellet residence where the murder occurred, using Thompson as a front because of appellant's concern that due to his "implication ... he wouldn't sell it to me." N.T. June 4, 1981, at 897.

This tap was executed pursuant to 18 Pa.C.S. § 5704(2)(ii), which states it shall *not* be unlawful for:

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire or oral communication involving suspected criminal activities where:

(i) such officer or person is a party to the communication; or

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom.

It is this section which appellant contends was violated by the district attorney's investigator's conduct and which he claims is unconstitutional.

 Appellant first claims the wiretap was not pursuant to section 5704(2)(ii) because the investigation did not involve "suspected criminal activities", as "that term means either ongoing or future criminal activities and does not include past criminal activities." Appellant's Brief at 107. Even if we were to accept appellant's narrow interpretation of the term "suspected criminal activities," and we by no means do so, appellant's argument still fails. It is clear that in Pennsylvania, " '[w]here there is evidence that the

conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such agreement may reasonably be inferred, the conspiracy may be found to continue.'" *Commonwealth v. Pass*, 468 Pa. 36, 46, 360 A.2d 167, 171 (1976), *quoting United States v. Hickey*, 360 F.2d 127, 141 (7th Cir.1966); *see also Commonwealth v. Evans*, 489 Pa. 85, 413 A.2d 1025 (1980). Evidence of "certain steps after the principal objective" may include attempts to conceal the crime. *Commonwealth v. Tumminello*, 292 Pa.Super. 381, 437 A.2d 435 (1981). The record of the pre-trial hearing makes clear such evidence existed in the instant case.[19] Hence, the "suspected criminal activities" necessary for the wiretap were ongoing when the tap was executed.

It is also argued that appellant's motion to suppress the intercepted conversations was unlawfully denied, as the hearing court did not make findings of fact or conclusions of law pursuant to Pa.R.Crim.P. 323(i).[20] Appellant is wrong; such findings were in fact made by the trial judge. See N.T. March 9, 1981, at 141–42.

 Appellant puts forth, in conclusory fashion, various constitutional challenges to section 5704(2)(ii). However,

---

**19.** For example, the "Officer's Memorandum" submitted to the district attorney for his review stated:

> Since the 19 November 1980 meeting with Thompson, he has received numerous phone calls to his apartment from Hasine [sic] and Orlaski [sic] to find out what he said to police and requesting Thompson not to get involved and not to talk to police. Thompson has advised police that Hasine [sic] phoned Thompson's apartment as recently as 20 November 1980; Thompson fully believes Hasine [sic], Orlaski [sic] or their associates ... will be contacting Thompson again either by phone or at Thompson's apartment.

This document was admitted into evidence at the pre-trial hearing held on March 9, 1981, and was signed by all police and district attorney's detectives who interviewed Thompson. The information in this document was corroborated by Detective Stephen Battershell of the Bucks County District Attorney's office. N.T. March 9, 1981, at 114.

**20.** The Commonwealth contends that this issue has been waived by appellant. However, appellant preserved the right to file supplemental reasons in support of his Omnibus Motion for pre-trial relief, and included this argument in his Second Supplemental Reasons filed April 16, 1982. Hence, we find the issue preserved.

we shall address only one constitutional challenge, as appellant has failed to adequately and properly raise and develop the additional constitutional issues [21] in his brief; in short, "[w]e decline to become appellant's counsel." *Commonwealth v. Sanford*, 299 Pa.Super. 64, 67, 445 A.2d 149, 150 (1982).

Appellant's remaining constitutional challenge to section 5704(2)(ii) is that the electronic surveillance permitted by the section, and specifically the interceptions which occurred here, constitutes an illegal search and seizure under Article I, section 8 of the Pennsylvania Constitution,[22] in that law enforcement officials can and did intercept communications without a warrant issued by a neutral and detached judicial officer. Essentially, appellant argues Article I, section 8 requires stricter standards regarding search and seizures than the Fourth Amendment to the United States Constitution.[23] These standards, he claims, were

**21.** These conclusory challenges are: (1) the section denies appellant due process of law in that it provides no standards to apply in authorizing a tap; (2) the section allows electronic surveillance which constitutes an unreasonable invasion of privacy under the Pennsylvania Constitution; and (3) the section allows an unconstitutional abridgment of appellant's right to free speech under the Pennsylvania Constitution. These issues, although raised below in post-verdict motions, were neither briefed nor argued below, nor were they addressed in the lower court's opinion. They are, therefore, waived. *Commonwealth v. Pittman*, 320 Pa.Super. 166, 170–172, 466 A.2d 1370, 1372 (1983). Appellant also makes an equal protection argument which, because it was never raised below, is waived. Pa.R.Crim.P. 302.

**22.** This section reads:
**§ 8. Security from searches and seizures**
The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

**23.** U.S. CONSTITUTION, amend. IV:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

violated here; therefore, appellant asks us to declare the evidence derived from the wiretap to have been unlawfully obtained. As a consequence, appellant prays that the unconstitutional evidence be suppressed and a new trial be granted.

Any review of the constitutionality of a statute must be conducted in light of the long established and "strong presumption in favor of the constitutionality of statutes—a presumption which reflects on the part of the judiciary the respect due to the legislature as a co-equal branch of government." *School District of Deer Lakes v. Kane,* 463 Pa. 554, 562, 345 A.2d 658, 662 (1975) (footnote omitted). Thus, in this, as in any challenge to a statute's constitutionality, the challenger has the burden of proving the statute *"clearly, palpably* and *plainly"* violates the Pennsylvania Constitution. *Daly v. Hemphill,* 411 Pa. 263, 271, 191 A.2d 835, 840 (1963) (emphasis in original).

It is true, of course, that states may impose stricter standards for searches and seizures than are required by the United States Constitution. *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *Commonwealth v. Harris,* 429 Pa. 215, 239 A.2d 290 (1968). Indeed, as appellant points out, the Pennsylvania Supreme Court has, in at least one instance, interpreted the rights given to individuals under Article I, § 8, of the Pennsylvania Constitution as providing greater protection than mandated by the Fourth Amendment. *Commonwealth v. DeJohn,* 486 Pa. 32, 49, 403 A.2d 1283, 1291 (1979) ("under Art. I § 8, of the Pennsylvania Constitution bank customers have a legitimate expectation of privacy in records pertaining to their affairs kept at the bank"); *contra, United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (no expectation of privacy, hence, no Fourth Amendment interests, in bank records). Appellant now urges this court to take the same, broad approach to wiretaps; i.e., Article I, § 8, requires either a warrant issued by a judicial officer or the consent of the objecting party. We decline to do so.

First, it is abundantly clear that the type of wiretap executed here, similar to the one-conversant, consensual tap allowed under federal law,[24] is legal under the United States Constitution. *United States v. Caceres,* 440 U.S. 741, 744, 99 S.Ct. 1465, 1467, 59 L.Ed.2d 733 (1979) ("Neither the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government Agents with the consent of one of the conversants."); *see also United States v. Horton,* 601 F.2d 319 (7th Cir.1979); *United States v. Shaffer,* 520 F.2d 1369 (3d Cir.1975). Thus, to the extent Article I, § 8 incorporates the dictates of the Fourth Amendment, section 5704(2)(ii) is constitutional.

Are there additional guarantees under Article I, § 8, which make § 5704(2)(ii) constitutionally infirm? Our research has been unable to unearth a Pennsylvania appellate court case which addresses the issue. However, we find instructive a recent federal case wherein the defendant challenged the Wiretap Act under the Pennsylvania Constitution. *United States v. Geller,* 560 F.Supp. 1309 (E.D.Pa. 1983). In *Geller,* as in the instant case the defendant argued that Article I, § 8, went further than the Fourth Amendment guarantees and, in light of this Commonwealth's jurisprudential history, " 'any' legislation which permits the interception of wire communication is *per se* violative of Pennsylvania's Constitution." *Id.* at 1315.

In rejecting the defendant's contention, the *Geller* court noted that while prior Pennsylvania statutes, and the case law interpreting them, forbade many types of wiretaps:

[t]hese statements, to the extent they are not dictum, demonstrate that *absent* prophylactic legislation, wiretapping and eavesdropping might continue unabated. In other words, Pennsylvania's Constitution, unaided by, and

---

**24.** 18 U.S.C. § 2511(2)(c) provides:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

unadorned with, appropriate legislation is, by itself, apparently incapable of preventing wiretapping. Therefore, defendants' suggestion that 'any' statute, which authorizes and regulates wiretapping is *necessarily* repugnant to the Constitution is erroneous. Simply stated, if the Constitution does not prevent wiretapping, passage of a statute authorizing its use does not *ipso facto* violate the same document.

*Id.* at 1316 (emphasis in original). While we agree with the *Geller* court that the Pennsylvania Constitution does not prohibit any and all legislation which permits wiretaps, the question we face here is whether it prohibits *this* legislation. Previously, this Commonwealth, through legislation known as the "Anti-Wiretap Statute,"[25] banned all consensual wiretaps except where the consent of *all* the parties to the conversation had been obtained. *Commonwealth v. Papszycki*, 442 Pa. 234, 238–39, 275 A.2d 28, 30–31 (1971); *Commonwealth v. Murray*, 423 Pa. 37, 223 A.2d 102 (1966). Indeed, in *Murray*, Mr. Justice Musmanno, with his usual verve, explained the underpinnings of the anti-wiretap act as follows:

Section 8 of Article I of the Pennsylvania Constitution and the Fourth Amendment to the Constitution of the United States are dedicated to this right to be let alone. But if detectives and private intermeddlers may, *without legal responsibility,* peer through keyholes, eavesdrop at the table, listen at the transom and over the telephone, and crawl under the bed, then all constitutional guarantees become meaningless aggregation of words, as disconnected as a broken necklace whose beads have scattered on the floor.

*Id.*, 423 Pa. at 51–52, 223 A.2d at 102 (emphasis added); *see generally Geller, supra,* at 1316. Justice Musmanno's acute dislike of wiretaps is clear. However, he also makes clear the anti-wiretap act was a distinct policy decision by the legislature against allowing one party consensual wire-

**25.** Act of July 16, 1957, P.L. 956, No. 411, § 1, 18 P.S. § 3742, repealed.

tap. *Id.*, 423 Pa. at 42–43, 223 A.2d at 105. There is no mention or inference that Article I, § 8 is or was more sweeping in its protections than the Fourth Amendment.

Basically, under the then-existing statute, the legislature declined to give "legal responsibility" to law enforcement officers for wiretaps. This prior legislation was a decision, *by the legislature,* "as a matter of state public policy that the right of any caller to the privacy of his conversation is of greater societal value than the interest served by permitting eavesdropping or wiretapping." *Commonwealth v. Papszycki, supra,* 442 Pa. at 239, 275 A.2d at 30. That determination was "within constitutional limits, [and] solely within the discretion of the Legislature." *Id.*, 442 Pa. at 30–31, 275 A.2d at 30–31.

 Just as clearly, the enactment of § 5704(2)(ii) was within both Constitutional limits *and* the discretion of the legislature. The General Assembly has given legal responsibility [26] to law enforcement officials to properly conduct wiretaps where one party consents. The function of determining whether or not to permit this type of wiretap was delegated by the Constitution to the General Assembly. *Commonwealth v. Baldwin,* 282 Pa.Super. 82, 422 A.2d 838 (1980); *Commonwealth v. Bennett,* 245 Pa.Super. 457, 369 A.2d 493 (1976). In such a situation, we shall not disturb the legislature's exercise of discretion, especially where the statute does not "clearly, palpably and plainly" violate the Pennsylvania Constitution.

## 7. SUFFICIENCY OF EVIDENCE.

Appellant argues that the evidence was insufficient to sustain a conviction of first degree murder. Specifically, he contends no evidence exists regarding any specific intent to kill the murder victim, James Puerale.

 "[T]he test for sufficiency of the evidence is whether accepting as true all of the evidence reviewed in the light most favorable to the Commonwealth, together with all

**26.** *See* 18 Pa.C.S. §§ 5704(2)(ii) and 5714(a).

reasonable inferences therefrom, the trier of fact could have found that each element of the offenses charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Lovette*, 498 Pa. 665, 669, 450 A.2d 975, 977 (1982). The resolution of factual matters pertaining to appellant's mental state; i.e., appellant's specific intent, "is solely within the province of the jury and an appellate court will not disturb the jury's findings when there is support in the record for the verdict." *Commonwealth v. Bachert*, 499 Pa. 398, 406, 453 A.2d 931, 935 (1982). In addition, an accomplice's culpability may be established when, with the intent to promote or facilitate a crime, he solicits the perpetrator to carry out the crime or aids or attempts to aid the perpetrator in committing the crime. 18 Pa.C.S. § 306(c), (d). Even if an accomplice does not actually pull the trigger and is not present when the act occurs, he can be equally accountable for the killing. 18 Pa.C.S. § 306(b)(3).

 With these legal precepts as guideposts, we review the voluminous record. Here there was corroborated testimony clearly showing appellant's active participation in the implementation of the plan to kill Kellet, as well as any and all eyewitnesses who might happen to be at the scene. The extensive testimony included evidence that appellant procured the murder weapon, solicited Decker to shoot Kellet, drove Decker to the scene of the murder, and agreed to compensate Decker for carrying out the murders. As early as June, 1980, appellant instructed Decker to kill Kellet's wife, if she was on the scene, "because any witnesses had to go."

The record contains ample evidence of *Decker's* and *appellant's* specific intention to kill not only Kellet but the innocent bystander, Puerale, as well. This shared specific intent of principal and accomplice, necessary to sustain a first degree murder verdict, may be shown by direct and/or circumstantial evidence, and any reasonable inference therefrom. *Commonwealth v. Bachert, supra.* It was clearly and undeniably shown here. Hence, the conviction and

sentence cannot be disturbed on the grounds of insufficiency.

## 8. MOTION TO DISMISS INFORMATION.

Appellant claims it was error for the lower court to have denied his motion to dismiss the information. His argument is two-pronged: (1) the information did not comply with Pa.R.Crim.P. 225(b)(5); and (2) under 18 Pa.C.S. § 906, the Commonwealth should have been compelled to elect which inchoate offense it intended to proceed with at trial. We find the trial court's decision entirely proper.

Pa.R.Crim.P. 225(b)(5) dictates that any information, to be legally sufficient, shall contain "a plain and concise statement of the essential elements of the offense substantially the same as or cognate to the offense alleged in the complaint." Here, the information alleged that on August 22, 1980, appellant "did *conspire and agree*" with Orlowski and Decker, individually, to murder James Puerale, Skip Kellet, and Lois Kellet, and also with Decker to kill George Sofield. This information is valid and legally sufficient, as it charged an agreement, which is the essence of, indeed the definition of, a conspiracy. *Commonwealth v. Emmi*, 290 Pa.Super. 86, 434 A.2d 142 (1981); 18 Pa.C.S. § 903(a).[27]

As to appellant's second prong, we adopt the well-reasoned opinion of the lower court, *viz.*:

We likewise reject the further contention that the Commonwealth should have been compelled to elect prior to trial among the inchoate offenses of conspiracy, attempt and solicitation charged against both defendants. Section 906 of the Crimes Code, 18 Pa.C.S.A. § 906 provides, "A person may not be convicted of more than one offense

---

27. Appellant argues some distinct, overt act, in addition to the agreement, must be charged in the information pursuant to 18 Pa.C.S. § 903(e). We have long held, however, precisely to the contrary. *Commonwealth v. Breslin,* 194 Pa.Super. 83, 165 A.2d 415 (1960); *Commonwealth v. Weldon,* 159 Pa.Super. 447, 48 A.2d 98 (1946); *cf. Commonwealth v. Taylor,* 324 Pa.Super. 420, 471 A.2d 1228 (1984).

defined by this chapter for conduct designed to commit or to culminate in the commission of the same crime." The only prohibition is against multiple convictions for inchoate offenses, not prosecution on multiple charges. In this regard we accept the word "conviction" as referring to post-verdict judgment by a court, and not to the verdict by the jury itself, and we will follow the leading of *Commonwealth v. Finkelstein*, 191 Pa.Superior Ct. 328 [156 A.2d 888] (1959) and *Commonwealth v. Socci*, 177 Pa.Superior Ct. 426 [110 A.2d 862] (1955). The thrust of Section 906 as we understand it is to prevent imposition of sentence for multiple inchoate offenses, and nothing less. This Court recently noted that there is no apparent authority mandating election pre-trial between inchoate offenses: See *Commonwealth v. Allen*, 38 Bucks Co.L. Rep. 192 (1982). To limit the Commonwealth's development of its case early on as defendants suggest would run contrary to the liberality just endorsed to plead offenses alternatively in anticipation of different avenues of proof at trial. Absent any indication in the Crimes Code or Criminal Rules that such a stringent approach is intended, we will not condone an interpretation which unreasonably handcuffs the prosecution. We see no harm to either defendant in here following this rationale, since the evidence that was presented would have been the same (proof of the underlying conspiracy itself, plus additional, probative proof of corroborative circumstances) in either event, with the only difference being the content of the trial judge's instructions to the jury. Defense counsel suggests the danger of a compromise verdict, but that argument needs no discussion here inasmuch as the jury found against defendants on all counts. If an error of law is the result of the Court's failure to strictly follow the letter of Section 906 of the Code, the appropriate remedy would be to later vacate the judgment of sentence and arrest judgment on one conviction or the other. *Commonwealth v. Wanamaker*, 298 Pa. Superior Ct. 283, [444] 44 A.2d 1176 (1982).

Lower Court Opinion at 23–24.[28]

## 9. BILL OF PARTICULARS.

According to appellant, it was error as a matter of law, or abuse of discretion, for the trial court to have denied his application for a Bill of Particulars. He claims the requested particulars "were necessary to legally inform appellant of the charges against which he had to defend." Appellant's Brief at 144. We do not agree.

An application for a Bill of Particulars is "addressed to the lower court's discretion." *Commonwealth v. Scott*, 469 Pa. 258, 265, 365 A.2d 140, 143 (1976); Pa.R.Crim.P. 304(d). We find no abuse of discretion here. There is no evidence that the Commonwealth withheld exculpatory evidence, or evidence otherwise favorable to the defense; [29] nor were any exceptional circumstances alleged. In addition, no "surprises" were shown to have occurred at trial. In such a situation we decline appellant's invitation to find an abuse of discretion. *Commonwealth v. Mamon*, 449 Pa. 249, 261–62, 297 A.2d 471, 478 (1972).

## 10. MOTION TO COMPEL PSYCHIATRIC EXAMINATION OF WILLIAM ERIC DECKER.

Appellant's next assignment of error relates to the lower court's refusal, pre-trial, to compel Commonwealth witness William Eric Decker to submit to a psychiatric examination. He contends such an examination would have provided evidence regarding Decker's competency as a witness and his capacity or ability to have formed the specific intent necessary to eventually find appellant guilty of first degree murder.

**28.** We note that the subsequently decided opinion in *Commonwealth v. Maguire*, 307 Pa.Super. 80, 452 A.2d 1047 (1982), is in accord with the decisions of *Commonwealth v. Finkelstein* and *Commonwealth v. Socci* which are cited by the lower court.

**29.** Indeed, the lower court, in its opinion, noted that appellant received extensive information from the Commonwealth's compliance with Pa.R.Crim.P. 305 B, as well as from *two* preliminary hearings. We agree with the court that this information provided appellant with ample information to prepare his defense. *Cf., Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981).

■■ The issue of the competency of a witness is to be resolved by the trial judge, and any such determination will not be overturned where no manifest abuse of discretion can be shown. *Commonwealth v. Fultz*, 316 Pa.Super. 260, 462 A.2d 1340 (1983). In the instant case, appellant contends a psychiatric examination "would have provided evidence on Decker's competency." Appellant's Brief at 152. While this might well have been true, it does not automatically mean such an examination was necessary in this case. Indeed the appellant makes no factual allegations to show that Decker was in any way *in*competent at the time he testified at trial. Appellant does not argue, and the record does not provide any evidence of mental infirmity on the part of Decker. Likewise, appellant does not maintain that Decker was under the influence of any drug, *at the time he testified.* Under the circumstances of this case, we refuse to disturb the trial judge's exercise of his discretion, especially in light of the fact that he was also the judge who accepted the witness' guilty plea and thereby had ample opportunity to observe Decker. *Commonwealth v. Rolison*, 473 Pa. 261, 374 A.2d 509 (1977).

Appellant's second argument is that, because Decker's ability to form the specific intent to kill the victim was the "pivotal issue of the case," his request for a psychiatric examination of Decker was justified and necessary. As the testimony at trial brought out, Decker was a steady user of methamphetamine and marijuana, and had used these drugs on the night of the shooting. Appellant contends the lower court denied him the opportunity to develop evidence which would have shown the effect these drugs had on Decker's mental abilities on August 22, 1980, evidence which would have negated the element of specific intent necessary for a conviction of first degree murder.

■■■ Our supreme court has clearly decided that psychiatric evidence is admissible when an accused offers it to negate the element of specific intent in a prosecution of first degree murder. *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976). However, whether or not to *order*

a psychiatric examination of a witness is within the sound discretion of the trial judge. *Commonwealth v. Garcia,* 478 Pa. 406, 387 A.2d 46 (1978). We do not believe the lower court committed reversible error in refusing appellant's request, as appellant had other opportunities to develop exculpatory evidence regarding Decker's mental state without resorting to a compelled psychiatric examination.

There is no dispute in this case that Decker's counseled guilty plea was voluntarily, knowingly and understandingly entered. At trial, Decker testified unequivocally that he had the intent to kill anyone who happened to be a witness to the murder of Skip Kellet. N.T. June 1, 1981 at 27–28. On cross-examination by appellant's counsel, Decker was subjected to close questioning as to this intent, as well as to the effect drugs had on his mental state on the night of August 22, 1980.[30] Although he chose not to, appellant could have offered expert testimony as to the effect methamphetamine would have on an individual's cognative processes, thereby casting doubt on Decker's ability to form

30. For example, appellant's counsel elicited from Decker testimony that Decker had injected "a couple of grams of speed" on the day of the shooting. N.T. June 1, 1981, at 134. In addition, the following exchange occurred:

Q. And on the 22nd, the day you killed someone, you used at least two grams by nine o'clock, yes?
A. Right.
Q. Tell the jury, please, what the effect of speed was on your personality?
A. It makes me not care.
Q. Explain to the jurors what you mean when you say it makes you not care.
A. It just changes my personality, that's all.
Q. Please tell the jurors how it changes your personality.
A. It makes me different.
Q. Tell us, please, how it makes you different.
A. It makes me meaner; I don't care.
Q. Meaner; makes you not care?
A. (Pause)
Q. Is that what you're saying?
A. Yeah.

＊ ＊ ＊ ＊ ＊ ＊

Q. Would it be correct to say, Mr. Decker, that when you use speed you become cold?
A. Yeah.

the required intent. Thus, the trial court's refusal to compel Decker to submit to a psychiatric examination did not preclude appellant from developing the exculpatory evidence he sought to put before the jury. In the circumstances of this case, we do not find reversible error.

## 11. PROSECUTORIAL MISCONDUCT—PLEA BARGAIN.

This assignment of error deals with the purported plea agreement between Decker and the Commonwealth. Appellant contends that neither the defense nor the jury was adequately informed of the terms of the agreement. This claim is frivolous. Both during the pre-trial hearing (see N.T. January 19, 1981, at 2, 24–25) and the trial (see N.T. June 1, 1981, at 105–07), the terms of the agreement were elicited from Decker. The witness pled guilty to first degree murder, criminal attempt to commit murder and conspiracy to commit murder. As part of this "negotiated plea" Decker was to secure the Commonwealth's promise to recommend a life sentence, and to recommend concurrent sentences on the other charges. Apparently, in these negotiations the Commonwealth attempted to make Decker's testimony against appellant a "part of" this agreement; the sentencing judge explicitly refused to allow this promise to

Q. Pardon?
A. Yes.
Q. Would it be correct to say you became cold-blooded?
A. No, I don't think I was cold-blooded.
Q. You were certainly cold-blooded on the night of August 22nd, weren't you?
A. That's correct.
Q. Was that because of the speed?
A. Maybe; maybe not.
Q. Would it be correct to say, Mr. Decker, that when you're on speed you don't think before you do things?
A. Sometimes.
Q. Would that be true on the night of August 22nd: You didn't think before you did things that night as a result of the speed?
A. No, not really.
I should have thought more.
Q. But you did think before you did what you did, yes?
A. Right.
N.T. June 1, 1981, at 136–38.

testify to become a "part of any plea bargain." N.T. January 19, 1981, at 2. This was precisely Decker's testimony at trial.[31] Appellant's argument is baseless.

## 12. AFTER-ACQUIRED EVIDENCE.

 In his post-verdict motion, appellant argued a new trial was warranted by virtue of evidence acquired by appellant's new counsel [32] after the trial had concluded. He renews this claim on appeal, as well as his claim that trial counsel's failure to investigate and discover the allegedly exculpatory evidence constituted ineffective assistance of counsel.

This "after-acquired" evidence appears on the record as representations made by Thomas Mellon, appellant's subsequently retained attorney, that a Mr. Marsden and a Mr. Maglio would testify they were told by Decker a version of the August 22, 1980, shooting, which differed from Decker's pre-trial and trial testimony. N.T. May 5, 1982, at 96–97. These representations of appellant's counsel, regarding "expected testimony" of dubious admissibility under the hearsay exceptions, go to credibility (of Decker) and are not of the character or nature likely to result in a different verdict. *Commonwealth v. Valerrama*, 479 Pa. 500, 388 A.2d 1042 (1978). As such, they do not meet the requirements which must be met to base a new trial upon after-discovered evidence. *Commonwealth v. Mosteller*, 446 Pa. 83, 88, 284 A.2d 786, 787 (1971).

In light of our holding, we do not find trial counsel to have been ineffective in failing to discover or investigate this "expected testimony."

**31.** In addition, the record reveals that appellant's trial counsel closely questioned Decker as to the precise terms of any agreement or understanding he had with the Commonwealth which related to his decision to testify. *See* N.T. June 1, 1981, at 130–32.

Because we find the plea agreement was adequately described to the jury, appellant's related argument that he should have been allowed to present "after-discovered evidence" as to Decker's motivation for testifying also fails.

**32.** Sometime after trial, Thomas Rutter either resigned or was dropped by appellant as his attorney.

## 13. INEFFECTIVENESS OF COUNSEL.

■ This is perhaps appellant's most meritless, and certainly his most ironic, assignment of error. A casual reading of this decision would evidence that an experienced and skilled trial attorney preserved for our review on appeal a substantial number of assignments of error. Appellant lists ten instances of trial counsel's ineffectiveness. A careful review of the record leads this court to the conclusion that none have merit.

Indeed the lower court, on May 7, 1982, held an evidentiary hearing, at which Mr. Rutter, trial counsel, testified. During direct examination, Mr. Rutter was asked to address each of these alleged points of error, and, as to each, he provided a reasonable basis for his course of action. *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). We agree with the lower court that its finding of effective assistance of counsel was "beautifully borne out by the record of the post-trial evidentiary hearing of May 7, 1982, where the extensive questioning of Victor Hassine's trial counsel, Thomas Rutter, portrayed him to be a criminal lawyer of considerable experience and ability." Lower Court Opinion at 40.

## 14. REQUEST FOR IN CAMERA INSPECTION OF THE COMMONWEALTH'S FILE.

Appellant next argues the lower court erred in failing to grant his request for an *in camera* inspection by the court of the Commonwealth's entire file to determine if any discovery material was not properly disclosed. More specifically, he bases this claim on the Commonwealth's alleged breach of its duty to disclose agreements between the Commonwealth and its witness(es) and regarding requested prior statements of witness Fred Tuite.

■ As to the first basis for appellant's argument, we need not reach it, having held that the Commonwealth

adequately and properly disclosed the nature and character of its agreement with Decker. *See* section 11, *supra.* As to the second contention, our supreme court has held that while all "pre-trial statements of its witnesses which have been reduced to writing and relate to the witnesses' testimony" must be supplied to defendants if they request them, *Commonwealth v. Gartner*, 475 Pa. 512, 524, 381 A.2d 114, 120 (1977), court inspection of the Commonwealth's file is not mandatory and will be necessary only when there is some reason to believe exculpatory evidence has not been disclosed. *Commonwealth v. Royster*, 472 Pa. 581, 372 A.2d 1194 (1977); *Commonwealth v. Martin*, 465 Pa. 134, 348 A.2d 391 (1975). The court here found no such reason,[33] and therefore properly denied appellant's request. *Commonwealth v. Gartner, supra.*

## 15. SENTENCING.

Appellant makes the argument that sentence imposed on him was unlawful in that he could not be convicted of more than one inchoate crime under 18 Pa.C.S. 906.[34] Specifically, he argues "[t]he offenses of 'attempt' and 'conspiracy' are both inchoate crimes defined in Chapter 9 of the Crimes

---

**33.** During appellant's trial counsel's cross-examination of the witness, Fred Tuite, the following occurred on the record:

> MR. RUTTER: Mr. Goldman, [the district attorney] do you have any record of any other reports? I want to make sure I have all the witness's statements.
> THE COURT: Does Mr. Rutter have all the witness's statements?
> MR. GOLDMAN: All that are taken in a report. They all are in that report form, Your Honor.
> THE COURT: All right.
> MR. RUTTER: I'm not sure about that. May we see you at side-bar? I want to make sure we haven't missed anything that's not in report form.
> THE COURT: There is no need to come to side-bar. If it is not in report form, there is nothing to give you.

N.T. June 3, 1981, at 590. Mr. Rutter apparently was satisfied with this response, as no further objection was made.

**34.** This section reads:

**§ 906. Multiple convictions barred**

A person may not be convicted of more than one offense defined by this chapter for conduct designed to commit or to culminate in the commission of the same crime.

Code ... [and therefore] pursuant to 18 Pa.C.S. § 906, only one sentence for an inchoate crime could be imposed." Appellant's Brief at 175.

 Section 906 was "designed to eliminate the conviction for more than one offense in the preparation to commit the objective," that is, where the offenses "were designed to culminate in the commission of *only one crime.*" *Commonwealth v. Zappacosta*, 265 Pa.Super. 71, 77, 401 A.2d 805, 808 (1979) (emphasis added), *citing, Commonwealth v. Crocker*, 256 Pa.Super. 63, 389 A.2d 601 (1978); *Commonwealth v. Turner*, 290 Pa.Super. 428, 434 A.2d 827 (1981). Thus, conviction of conspiracy and attempt to commit a crime is illegal where both these inchoate offenses relate to conduct "designed to end in the same ultimate crime," for example burglary of a particular house. *Commonwealth v. Jackson*, 280 Pa.Super. 522, 525, 421 A.2d 845, 846 (1980); *Commonwealth v. Turner, supra.* This was not what occurred here.

The sentencing order in the instant case provides, in pertinent part:

On Criminal Action 3850–01, as to the third count [conspiracy with William Eric Decker to murder Albert "Skip" Kellet], the Court orders and directs that you pay the cost of prosecution and serve a sentence in a state correctional institution for a minimum of five years or a maximum of ten years and pay a fine in the sum of ten thousand dollars. This sentence is to take effect at the expiration of the minimum sentence imposed on Criminal Action 3850 of 1980.

On the fifth count of Criminal Action 3850–01 [conspiracy with William Eric Decker to murder Lois Kellet], the Court orders and directs that you pay the cost of prosecution and serve a sentence in a state correctional institution for a period of not less than five years nor more than ten years and pay an additional fine in the sum of ten thousand dollars. This sentence is to begin and take effect at the expiration of the minimum sentence heretofore imposed on the third count of this criminal information, namely 3850–01 of 1980.

Sentence is suspended on all other counts of this information.

On information 3850–03 of 1980, as to the third count [criminal attempt to murder George Sofield], the Court orders and directs that you shall pay the cost of prosecution and serve a sentence of not less than two years nor more than five years. This sentence is to be computed at the expiration of the sentence heretofore imposed on the fifth count of Criminal Action 3850–01 of 1980. Sentence is suspended on the first and second count of 3850–03. N.T. January 4, 1983, at 20–21.

█ Although it is not clear from appellant's brief, apparently he objects to the sentences on the conspiracy convictions and on the attempt conviction. However, as the order clearly states, these convictions were for separate crimes. The conspiracy to murder Lois Kellet, for example, had as its "ultimate crime" a different objective than the attempt to murder George Sofield, i.e., the actual murder of Lois Kellet would have been a different crime than the murder of George Sofield. Hence we find appellant has not met the "same crime" requirement of § 906. The trial court's sentencing was proper.

Judgment of sentence is affirmed.