**Commonwealth v. Bungarz**

C.P. of Berks County, no. 3302-97.

*Christine Sadler, assistant district attorney,* for Commonwealth.
*Jesse D. Searfoss,* for defendant.

LUDGATE, *J.,* December 7, 1998—On May 13, 1998, Robert William Bungarz was found guilty by a jury of Count One, rape, 18 Pa.C.S. §3121.1, Count Two, statutory sexual assault, 18 Pa.C.S. §3122.1, Count Three, involuntary deviate sexual intercourse, 18 Pa.C.S. §3123(a)(7), Count Four, sexual assault, 18 Pa.C.S. §3124.1, Count Five, indecent assault, 18 Pa.C.S. §3126(a)(8), Count Six, indecent exposure, 18 Pa.C.S. §3127, Count Seven, corruption of minors, 18 Pa.C.S. §6301(a) and Count Eight, terroristic threats, 18 Pa.C.S. §2706. The victim being a 15-year-old girl.

On May 13, 1998, based upon the verdict of the jury on the above charges, this court ordered the defendant to submit to an assessment by the Sexual Offender Assessment Board to determine whether the defendant is a "sexually violent predator" pursuant to 42 Pa.C.S. §9794. This section requires that "after conviction, but before sentencing, a court shall order a person convicted of a sexually violent offense specified in section 9793(b) to be assessed by the board."

It is significant to note that the defendant is not challenging the constitutionality of Megan's Law. This court recognizes the recent Superior Court decision in *Commonwealth v. Halye,* 719 A.2d 763 (Pa. Super. 1998), that found Megan's Law to be unconstitutional. How-

ever, as this issue remains an unsettled area of the law, this court will continue to address the procedure used in this case.

On July 7, 1998, pursuant to this court's order dated May 13, 1998, the defendant, accompanied by his attorney, was interviewed by Sexual Offender Assessment Board member Francise Gibson LSW.

On July 27, 1998, pursuant to this court's order dated May 13, 1998, the defendant, accompanied by his attorney, was interviewed by Sexual Offender Assessment Board member Bruce E. Mapes Ph.D.

On June 14, 1998 and August 3, 1998, respectively, both Sexual Offender Assessment Board members submitted written evaluations to this court. A copy of each evaluation was disseminated to counsel on the date of the board member's testimony.

On August 5, 1998, this court conducted a hearing pursuant to 42 Pa.C.S. §9794.[1] Bruce E. Mapes Ph.D. was called to testify for the purpose of determining if the defendant was a "sexually violent predator." He concluded that the defendant could be excluded from the classification of a "sexually violent predator." Due to time constraints on the Sexual Offender Assessment

---

1. "Upon receipt of the board's report, the court shall determine if the offender is a sexually violent predator. This determination shall be made based on evidence presented at a hearing held prior to sentencing and before the trial judge. The offender and district attorney shall be given notice of the hearing and an opportunity to be heard, the right to call witnesses, the right to call expert witnesses and the right to cross-examine witnesses. In addition, the offender shall have the right to counsel and to have a lawyer appointed to represent him if he cannot afford one. After a review of all evidence presented at this hearing, the court may determine whether the presumption arising under subsection (b) has been rebutted and shall set forth this determination on the sentencing order." 42 Pa.C.S. §9794(e).

Board members, this court continued the hearing until August 27, 1998.

On August 27, 1998, Francise Gibson LSW was called to testify for the purpose of determining if the defendant was a "sexually violent predator." She concluded that the defendant should not be considered a "sexually violent predator" and may be excluded from the classification.

On August 27, 1998, at the conclusion of the testimony, this court concluded that based upon the testimony presented by Dr. Mapes, Francise Gibson, exhibits C-1, C-2, C-3 and C-4 and the conclusion of each expert that as a matter of law, the defendant is not a "sexually violent predator."

Immediately following the hearing to determine if the defendant was a "sexually violent predator," a sentencing hearing was conducted.

On August 27, 1998, the defendant was sentenced to be committed for a period of not less than six years nor more than 15 years to the Bureau of Corrections for confinement in a state correctional facility on Count One, rape. The defendant was sentenced to be committed for a period of not less than nine months nor more than 24 months to the Bureau of Corrections for confinement in a state correctional facility on Count Eight, terroristic threats. The sentence for Count Eight to run concurrent with the sentence imposed on Count One. The defendant having been sentenced on Counts One and Eight, this court granted the Commonwealth's motion to dismiss Counts Two through Seven.

An appeal was timely filed on September 25, 1998. On September 28, 1998, this court entered a concise statement order, with which the defendant complied on October 8, 1998. This opinion is written pursuant

to Rule 1925(a) Pa.R.A.P. and in support of this court's ruling in this matter.

On appeal, the defendant alleges 12 points of error:

(1) The evidence is insufficient to sustain the verdicts of guilty on charges of rape, statutory sexual assault, involuntary deviant sexual intercourse, sexual assault, indecent assault, indecent exposure, corruption of minors and terroristic threats.

(2) The finding of guilt by the jury is counter and against the weight of the evidence as to the charges of rape, statutory sexual assault, involuntary deviant sexual intercourse, sexual assault, indecent assault, indecent exposure, corruption of minors and terroristic threats.

(3) The trial court erred in not granting defendant's motion for dismissal of the charges made after the Commonwealth's repeated failure to file an answer to defendant's bill of particulars, a failure which was in direct violation of an order of that honorable court.

(4) The trial court erred in allowing the Commonwealth to present the testimony of Susan Brennan, who was not a named witness on the Commonwealth's response to the defendant's bill of particulars, and thus should have been precluded from providing testimony pursuant to Pa.R.Crim.P. 304.

(5) The trial court erred in not granting defendant's timely made motion for judgment of acquittal at the close of the Commonwealth's presentation of evidence.

(6) The trial court erred in not allowing testimony by the defendant and/or defense witnesses regarding the physical conduct of the victim toward the defendant, subsequent to allowing the Commonwealth to present the testimony of the same, the morning after the offense allegedly occurred.

(7) The trial court erred in not allowing testimony by the defendant and/or defense witnesses regarding the conversation held by the victim with the defendant the morning after the offense allegedly occurred.

(8) The trial court erred in not allowing testimony by the defendant and/or defense witnesses regarding the physical conduct of the defendant toward relative of the defendant, while the defendant was present along with the victim at HersheyPark Amusement Park the day after the offense allegedly occurred.

(9) The trial court erred in not allowing testimony by the defendant and/or defense witnesses regarding the act of the victim in seeking help from the defendant when the victim was approached in a threatening manner by other men at HersheyPark Amusement Park the day after the offense allegedly occurred.

(10) The trial court erred in not allowing testimony by the defendant and/or defense witnesses regarding the choice of physical attire in which the victim chose to present herself while at HersheyPark Amusement Park while in the presence of the defendant during the entire day after the offense allegedly occurred.

(11) The trial court erred in not granting the defendant's timely motion for judgment of acquittal subsequent to the verdict by the jury.

(12) The trial court erred in not granting the defendant's various motions for extraordinary relief prior to sentencing.

We will address each issue in turn.

*(1) Was the evidence insufficient to sustain the verdicts of guilty on charges of rape, statutory sexual assault, involuntary deviant sexual intercourse, sexual assault, indecent assault, indecent exposure, corruption of minors and terroristic threats?*

*(5) Did the trial court err in not granting defendant's timely made motion for judgment of acquittal at the close of the Commonwealth's presentation of evidence?*

*(11) Did the trial court err in not granting the defendant's timely motion for judgment of acquittal subsequent to the verdict by the jury?*

In the interest of judicial economy and based upon the similarity of these claims, these issues will be addressed together.

Pa.R.Crim.P. 1124 (challenges to sufficiency of evidence) states that a defendant may challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged in one or more of the following ways:

"(1) a motion for judgment of acquittal at the close of the Commonwealth's case in chief;

"(2) a motion for judgment of acquittal at the close of all the evidence;

"(3) a motion for judgment of acquittal filed within 10 days after the jury has been discharged without agreeing upon a verdict;

"(4) a motion for judgment of acquittal made orally immediately after verdict;

"(5) a motion for judgment of acquittal made orally before sentencing pursuant to Rule 1405.B;

"(6) a motion for judgment of acquittal made after sentence is imposed pursuant to Rule 1410(B); or

"(7) a challenge to the sufficiency of the evidence made on appeal."

The defendant alleges that the evidence presented by the Commonwealth was insufficient to support his convictions on each of the crimes charged. The standard of review for a claim challenging the sufficiency of the evidence "is whether, viewing all evidence admitted

at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Yanoff,* 456 Pa. Super. 222, 229, 690 A.2d 260, 263 (1997), quoting *Commonwealth v. Torres,* 396 Pa. Super. 499, 501, 578 A.2d 1323, 1324 (1990). (citations omitted) The prerogative of the fact-finder is to believe all, part, or none of the evidence presented. *Id.*

The testimony at trial presented the following facts to the jury:

On July 29, 1997, the victim Heather Blackwood,[2] age 15, arrived at the defendant's home. The victim and the defendant's stepdaughter Rheannon Boyer were friends and the victim was scheduled to spend the night and go to Hersheypark Amusement Park the following day with the Bungarz family. This was not the first time the victim had spent the night at the defendant's home. In fact, it was the second time she had spent the night in this particular home, which was relatively new to the defendant's family. The victim arrived at the defendant's home on July 29, 1997 at 9:30 p.m., went into the living room, sat down and talked with Rheannon, Jeff Bickel (Rheannon's boyfriend) and Jackie Bungarz (Rheannon's mother who is also the defendant's wife). After approximately 10 minutes, Jeff Bickel left and the victim and Rheannon went into the kitchen to get a snack. As the two girls were getting a snack, the defendant entered the kitchen. The defendant asked the victim about her softball game and gave her a hug during which time he touched her butt.

---

2. Heather Blackwood will hereafter be referred to as the victim.

The victim did not say anything to the defendant but instead gave him a weird look. She said she felt uncomfortable and really funny. The victim noticed that the defendant's eyes were bloodshot and she could smell alcohol on his breath. Furthermore, she noticed four beer cans in the sink. After this incident, the victim and Rheannon sat down and had a snack and the defendant left the room. At approximately 10 p.m., after the girls finished their snack, they went upstairs. Once upstairs, the victim went into the bathroom to take a shower but she kept the door cracked open because that was the house rule. After taking a shower, the victim went into Rheannon's room and asked to borrow night clothing because she had forgotten to bring her own. She borrowed a t-shirt and shorts from Rheannon. At approximately 10:30 p.m., the two girls then went back downstairs and talked with Jackie Bungarz. After talking for approximately 10 to 15 minutes, the victim told Jackie Bungarz and Rheannon that she was tired and was going to bed. Rheannon stated that she would be up in a few minutes, so the victim went upstairs to Rheannon's room alone. Upon entering Rheannon's bedroom, the victim laid down in the sleeping bag on the floor next to Rheannon's bed. After lying down for approximately five minutes, the victim heard the defendant come up to the door, stop in the doorway, come inside the room and sit beside her on the floor. The defendant put his hand over her mouth and told her to be quiet and he won't hurt her. The victim was still lying down at this point. The defendant then put his other hand on the outside of the victim's t-shirt and started to touch her breast. The victim stated that she did not want the defendant to touch her breasts. The defendant then lifted up the victim's t-shirt and put his hands under her shirt and started rubbing her

breasts. The victim stated that she did not say anything or scream because she was scared and shocked. The defendant then put his hands under the victim's boxer short and underwear and starting rubbing her vagina. The defendant's one hand was still over her mouth as this was occurring. As the defendant was rubbing her vagina, the victim pushed his hand away. In response, the defendant grabbed the victim's ponytail with one hand and started to unzip his pants. He pulled the victim up from her lying position to a position where she was sitting up. After unzipping his pants, the defendant pulled out his penis, put his penis inside the victim's mouth and told her to suck it. The victim stated that she did not scream or refuse because she was too scared. The victim stated that she did not want the defendant to put his penis inside her mouth or to rub her vagina. When the defendant put his penis inside her mouth, the victim bit his penis. In response, the defendant pushed the victim's head back and smacked her head. After the defendant smacked her in the head, the victim laid back down on the floor. The defendant then told the victim "be quiet and don't tell anybody or I'll kill you." The defendant then left the room. The victim stated that she did not yell, scream, kick or punch the defendant because she was scared and because he threatened her life. After the defendant left the room, the victim cried while lying on the floor. The victim testified that she did not want the defendant to rub her vagina or touch her in any way. Approximately five minutes later, Rheannon came into the room and attempted to speak to her. The victim pretended to be sleeping and did not tell Rheannon because she was scared and testified that she did not know if Rheannon knew what had happened. The victim did not tell anyone of this incident on that evening. She did not attempt to call

anyone immediately after the incident or during the evening following the incident because she was scared and afraid for her life. (N.T. 5/8/98, pp. 107-24; 5/11/98, p. 186.)

The next morning, at approximately 8:45 a.m., the girls got up. The victim washed her face, got dressed and went down with Rheannon to eat breakfast. She had breakfast with Rheannon, Jackie Bungarz and the defendant. The victim did not tell anyone during breakfast of the incident. After breakfast, the victim telephoned her boyfriend, Kris Brennan. She did not tell him of the incident because the defendant was nearby and she was scared. Kris Brennan testified that he detected something was wrong by the tone of the victim's voice and that he noticed she was not being herself The victim then went upstairs to put on her makeup and then she came back downstairs and called her mother, using a different telephone. The victim did not tell her mother because the defendant walked into the room near the phone and she was scared. Monique Kiraly, the victim's mother, testified that her daughter was upset, irritated and not herself during their conversation. The defendant, Jackie Bungarz, Rheannon and the victim then went to Hersheypark Amusement Park in the Bungarz's car. Once at Hersheypark Amusement Park, the victim and Rheannon separated from the defendant and Jackie Bungarz. The victim did not tell Rheannon of the incident during the time they spent at Hersheypark Amusement Park. The victim did not tell anyone else during that time. At approximately 6:30 p.m., the victim, Rheannon, Jackie Bungarz and the defendant left Hersheypark Amusement Park. (N.T. 5/8/98, pp. 125-28, 150; 5/11/98, pp. 163, 173.)

On the way home, they stopped at the victim's stepfather's (Phil Harner) house to pick up a schedule for Rheannon. The victim got out of the car and went into the house on two occasions before leaving. She did not tell either Phil Harner or her grandmother of the incident. The defendant was then dropped off at the Bungarz residence; Jackie Bungarz and Rheannon drove the victim to Kris Brennan's house. At Kris Brennan's house, the victim exited the car and testified that she saw Susan Brennan, Kris Brennan's mother. Susan Brennan testified that the victim appeared to be upset or disturbed. The victim spent approximately 45 minutes at Kris Brennan's house. During that time, she did not tell Kris Brennan of the incident either. Kris Brennan testified that the victim was not herself during the time she spent at his house and he repeatedly asked her what was wrong. The victim stated that she did not tell either Kris Brennan or his mother because she was scared and confused. After she was at Kris Brennan's house for approximately 45 minutes, the victim's mother, Monique Kiraly, picked her up. On the ride home, the victim did not tell her mother of the incident but cried the entire way home. She stated she did not say anything to her mother because she was trying to comprehend what had happened. Upon arriving home, the victim went to her room and called Kris Brennan. She did not tell him of the incident during this conversation. After ending the conversation with Kris Brennan, the victim told her stepsister, Kelly, who came into her room, what had happened. She then repeated the story to her mother. The victim testified she did not tell anyone of the incident for almost one day because she was scared and did not know what to do. The

victim also testified that she was not married to the defendant on the night of the incident. (N.T. 5/8/98, pp. 128-33; 5/11/98, pp. 174-75, 180.)

On August 2, 1997, Sergeant Stephen Yankowsky was contacted and given information regarding this incident. During the course of his investigation, Sergeant Stephen Yankowsky had an opportunity to speak to the defendant. Prior to questioning the defendant, Sergeant Stephen Yankowsky administered the defendant standard *Miranda* warning and the defendant waived his rights. During questioning, the defendant stated that he was 33 years old and he admitted that he consumed three beers on the night in question. When questioned about the sleeping arrangements, the defendant stated that this was the second time that the victim had slept over and that she slept on the floor. Sergeant Stephen Yankowsky further questioned the defendant on how he knew where the victim would sleep and the defendant replied that there was only one bed in the room and he just assumed that she slept on the floor. Sergeant Stephen Yankowsky then questioned the defendant as to whether he had been in Rheannon's room on the evening in question. The defendant answered that to the best of his knowledge, "no." Sergeant Stephen Yankowsky found this to be a very strange response. He further questioned the defendant on that response and the defendant stated that "he did not want to say something that was not correct." (N.T. 5/11/98, pp. 183-86.)

"A person commits a rape when, . . . 'he engages in sexual intercourse with another person not his spouse: (1) by forcible compulsion.' 18 Pa.C.S. §3121(1). Forcible compulsion is an act, including physical force as well as moral, psychological or intellectual force, used

to compel a person to engage in sexual intercourse against that person's will. *Commonwealth v. Rhodes,* 510 Pa. 537, [555,] 510 A.2d 1217, 1226 (1986). Moreover, the degree of that force is relative and depends on the totality of the facts and circumstances of the particular case. *Id." Commonwealth v. Riley,* 434 Pa. Super. 414, 417, 643 A.2d 1090, 1091 (1994). "This court has consistently held that threats of physical violence are sufficient to sustain a conviction; actual violence is not necessary." 18 Pa.C.S. §3101.

Sexual intercourse is defined as "in addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S. §3101. It is clearly established that there is no requirement that penetration reach the vagina or "farther reaches of the female genitalia . . . ." *Commonwealth v. McIlvaine,* 385 Pa. Super. 38, 47, 560 A.2d 155, 159 (1989) quoting *Commonwealth v. Ortiz,* 311 Pa. Super. 190, 457 A.2d 559 (1983).

"Moreover, a victim need not actively resist her assailant if such resistance is reasonably believed to be futile or dangerous." See *e.g., Commonwealth v. Riley,* 434 Pa. Super. 414, 417, 643 A.2d 1090, 1091 (1994); *Commonwealth v. Lee,* 432 Pa. Super. 414, 416-18, 638 A.2d 1006, 1008 (1994); *Commonwealth v. Montgomery,* 455 Pa. Super. 202, 687 A.2d 1131 (1996).

One of the requirements for rape is "penetration, however slight." 18 Pa.C.S. §3101 (Purdon's Supp. 1992). "[T]here is no requirement, however, that penetration reach the vagina." *Commonwealth v. Trimble,* 419 Pa. Super. 108, 112, 615 A.2d 48, 50 (1992), citing *Commonwealth v. McIlvaine,* 385 Pa. Super. 38, 47, 560 A.2d 155, 159 (1989).

"As to the charges of rape . . ., the Crimes Code provides that testimony of a victim need not be corroborated. 18 Pa.C.S. §3106." *Commonwealth v. Poindexter,* 435 Pa. Super. 509, 517, 646 A.2d 1211, 1214 (1994). "In *Commonwealth v. Gabrielson,* 370 Pa. Super. 271, 536 A.2d 401 (1988), this court held that the uncorroborated testimony of a rape victim, if believed by the jury, is sufficient to support a rape conviction and no medical testimony is needed to corroborate a victim's testimony if the testimony was rendered credible by the jury." *Commonwealth v. Poindexter,* 435 Pa. Super. 509, 517, 646 A.2d 1211, 1214 (1994).

In the case at bar, the victim testified that the defendant placed his hands over her mouth, told her to be quiet and that he wouldn't hurt her. The defendant then touched her breast, rubbed her vagina, grabbed her ponytail and put his penis into her mouth. The victim did not resist the defendant because she was scared. The defendant then told her "be quiet and don't tell anybody or I'll kill you."

In order to convict a defendant of statutory sexual assault, the Commonwealth must prove that the defendant engaged in sexual intercourse with the complainant who was under the age of 16 years and that the defendant is four or more years older than the complainant and the complainant and the defendant are not married to each other. 18 Pa.C.S. §3122.1.

Here, the defendant was 33 years of age when he engaged in sexual intercourse with the victim, age 15, and the defendant was not married to the victim.

The crime of involuntary deviate sexual intercourse occurs when "an individual engages in deviate sexual

intercourse with a complainant: . . . (7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other." 18 Pa.C.S. §3123.

"Deviate sexual intercourse is defined as sexual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal. The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S. §3101.

"In *Commonwealth v. Bruner,* 364 Pa. Super. 156, 527 A.2d 575 (1987), . . . [the Superior Court] held that involuntary deviate sexual intercourse included acts of forcing the perpetrator's penis into the mouth of the victim and compelling the victim to place his penis into the mouth of the assailant." *Commonwealth v. Troy,* 381 Pa. Super. 326, 330-31, 553 A.2d 992, 994-95 (1989).

"In *Commonwealth v. King,* 290 Pa. Super. 563, 434 A.2d 1294 (1981), [the Superior Court held that] a conviction for involuntary deviate sexual intercourse based upon conduct encompassing anal rape and the victim's forced performance of oral-genital intercourse upon her attacker." *Commonwealth v. Troy,* 381 Pa. Super. 326, 331, 553 A.2d 992, 995 (1989). The penetration requirement for involuntary deviate sexual intercourse is also "penetration, however slight." 18 Pa.C.S. §3101 (Purdon's Supp. 1992).

In *Commonwealth v. Poindexter,* 435 Pa. Super. 509, 519, 646 A.2d 1211, 1215 (1994), it was held that

"the victim testified that on two separate occasions, . . . Poindexter made her suck his 'private part.' Poindexter also threatened to whip her if the victim told anyone about the incident. This, along with the fact that the victim is 8 years old, constitutes involuntary deviate sexual intercourse."

"As to . . . involuntary deviate sexual intercourse, . . . the Crimes Code provides that testimony of a victim need not be corroborated. 18 Pa.C.S. §3106." *Commonwealth v. Poindexter,* 435 Pa. Super. 509, 517, 646 A.2d 1211, 1214 (1994).

In the instant case, the victim testified that she did not want the defendant to touch her breasts, rub her vagina or put his penis into her mouth. She explained that she did not stop the defendant, resist him, scream for help, punch, or kick him because she was scared for her life due to the defendant's threats.

The crime of indecent assault requires the Commonwealth to prove "that a person have indecent contact with another not his spouse, or causes such other to have indecent contact with him and that the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other." 18 Pa.C.S. §3126(a)(8).

"The Crimes Code . . . defines the phrase 'indecent contact' as 'any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in either person.' 18 Pa.C.S. §3101. While the term 'touching' has not been expressly defined by our legislature, this court has indicated that it includes contact between a bodily part with another object so

as to perceive it through the tactile sense. See *Commonwealth v. Grayson,* 379 Pa. Super. 55, 60 n.3, 549 A.2d 593, 596 n.3 (1988)." *Commonwealth v. Ricco,* 437 Pa. Super. 629, 632, 650 A.2d 1084, 1085 (1994). The facts already stated support that conviction.

A person commits indecent exposure if "that person exposes his or her genitals in any public place or in any place where there are present other persons under circumstances in which he or she knows or should know that this conduct is likely to offend, affront or alarm." 18 Pa.C.S. §3127.

The victim testified that while she was in Rheannon's bedroom, the defendant entered, unzipped his pants and pulled out his penis. Prior to doing so, the defendant told her to be quiet and he wouldn't hurt her.

The crime of corruption of minors is defined as "whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age." 18 Pa.C.S. §6301. In deciding what conduct can be said to corrupt the morals of a minor, "[t]he common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Commonwealth v. Pankraz,* 382 Pa. Super. 116, 121, 554 A.2d 974, 977 (1989), quoting *Commonwealth v. Randall,* 183 Pa. Super. 603, 133 A.2d 276 (1957). "Furthermore, '[c]orruption of a minor can involve conduct towards a child in an unlimited number of ways. The purpose of such statutes is basically protective in nature. These statutes are designed to cover a broad

range of conduct in order to safeguard the welfare and security of our children. Because of the diverse types of conduct that must be proscribed, such statutes must be drawn broadly. It would be impossible to enumerate every particular act against which our children need be protected.' *Commonwealth v. Todd,* 348 Pa. Super. 453, 462 n.2, 502 A.2d 631, 635 n.2 (1985), citing *Commonwealth v. Burak,* 232 Pa. Super. 499, 335 A.2d 820 (1975)." *Commonwealth v. Decker,* 698 A.2d 99, 101 (Pa. Super. 1997). The facts already stated support that conviction.

A person is guilty of terroristic threats if he or she "threatens to commit any crime of violence with intent to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience." 18 Pa.C.S. §2706.

"Accordingly, the Commonwealth must prove that (1) the defendant made a threat to commit a crime of violence, and (2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror. *Commonwealth v. Kelley,* 444 Pa. Super. 377, 386-87, 664 A.2d 123, 127-28 (1995)." *Commonwealth v. Tizer,* 454 Pa. Super. 1, 7, 684 A.2d 597, 600 (1996).

Here, a 15-year-old girl, who is at a friend's house, is alone at night in a bedroom with the defendant and is told to "be quiet and don't tell anyone or I'll kill you." These acts and statements were made while the defendant had his hands over the victim's mouth and after he had sexually assaulted her.

*(2) Was the finding of guilt by the jury counter and against the weight of the evidence as to the charges of rape, statutory sexual assault, involuntary deviant sexual intercourse, sexual assault, indecent assault, indecent exposure, corruption of minors and terroristic threats?*

The defendant contends that the guilty verdict reached by the jury on all of the charges is contrary to the weight of the evidence. The weight to be accorded the evidence presented is a determination reserved for the trier of fact, "who is free to believe all, some or none of the evidence." *Commonwealth v. Perez,* 698 A.2d 640, 645 (Pa. Super. 1997). A challenge to the weight of the evidence will result in a reversal of the verdict and a grant of a new trial only where the trier of fact's verdict is so contrary as to shock one's sense of justice. *Id.* See *Commonwealth v. Griffin,* 453 Pa. Super. 657, 673, 684 A.2d 589, 596-97 (1996).

For all the reasons stated above concerning the sufficiency of the evidence, this court finds this allegation made by the defendant to be without merit.

*(3) Did the trial court err in not granting defendant's motion for dismissal of the charges made after the Commonwealth's repeated failure to file an answer to defendant's bill of particulars, a failure which was in direct violation of an order of that honorable court?*

"An application for a bill of particulars is 'addressed to the trial court's discretion.' *Commonwealth v. Hassine,* 340 Pa. Super. 318, 361, 490 A.2d 438, 461 (1985) (quoting *Commonwealth v. Scott,* 469 Pa. 258, 265, 365 A.2d 140, 143 (1976)); Pa.R.Crim.P. 304. A bill of particulars is intended to give notice to the accused

of the offenses charged in the indictment so that the accused may prepare a defense, avoid a surprise, or intelligently raise pleas of double jeopardy and the statute of limitations. *Commonwealth v. Chambers,* 528 Pa. 558, 580, 599 A.2d 630, 641 (1991)." *Commonwealth v. Mercado,* 437 Pa. Super. 228, 254-55, 649 A.2d 946, 959 (1994).

"The appropriate remedy to be applied 'in the interests of justice' when the Commonwealth fails to provide a full bill of particulars has been left to the discretion of the trial court. *Commonwealth v. Scott,* 469 Pa. 258, 265, 365 A.2d 140, 143 (1976); Pa.R.Crim.P. 304(d), 42 Pa.C.S. The Superior Court will reverse the trial judge's decision in such matters only in the face of a 'flagrant abuse of discretion.' *Commonwealth v. Albanesi,* 234 Pa. Super. 111, 114, 338 A.2d 610, 612 (1975). Absent allegations of exceptional circumstances, we will uphold the trial court's denial of relief where there is no indication that the Commonwealth deliberately withheld either exculpatory evidence or evidence otherwise favorable to the defense, where the defendant did receive information from the Commonwealth's compliance with other rules of procedure, and where the accused possessed adequate information on which to prepare a proper defense. *Commonwealth v. Hassine,* 340 Pa. Super. 318, 361, 490 A.2d 438, 461 (1985)." *Commonwealth v. Montvalvo,* 434 Pa. Super. 14, 28-29, 641 A2d 1176, 1183-84 (1994).

"A bill of particulars is not a substitute for discovery and the Commonwealth's evidence is not a proper subject to which a bill of particulars may be directed. . . . Furthermore, when there is no evidence that (1) the Commonwealth withheld exculpatory evidence, or

evidence otherwise favorable to the accused; (2) exceptional circumstances existed; or (3) 'surprises' occurred at the trial, we will not find an abuse of discretion. *Commonwealth v. Chambers, supra; Commonwealth v. Mamon,* 449 Pa. 249, 297 A.2d 471 (1972)." *Commonwealth v. Mercado,* 437 Pa. Super. 228, 255, 649 A.2d 946, 959 (1994).

On October 23, 1997, the defendant filed a bill of particulars. On November 17, 1997, the defendant filed a motion for relief under Pa.R.Crim.P. 304(c) and (d) for the Commonwealth's failure to provide an answer. On December 8, 1997, after conducting a hearing on the matter, this court issued an order allowing the Commonwealth an additional period of time until December 18, 1997, to respond to the defendant's motion. On January 8, 1998, the defendant again filed a motion for relief under Pa.R.Crim.P. 304(c) and (d) for the Commonwealth's failure to provide an answer. On January 27, 1998, upon agreement of counsel, the Commonwealth was given an extension of time to respond to the defendant's bill of particulars and that response shall be completed and filed on or before February 24, 1998. On February 25, 1998, the Commonwealth filed a response to the defendant's request for a bill of particulars.

Upon considering the information requested in the defendant's bill of particulars, the Commonwealth's answer, the length of time between the Commonwealth's response and the defendant's trial and the fact that the defendant agreed to granting the Commonwealth an extension on January 27, 1998, this court finds that the defendant had sufficient notice of the offense charged so that he could prepare a defense. Furthermore, the

defendant has failed to properly raise this issue as he did not demonstrate that he suffered any specific "surprise" during trial.

*(4) Did the trial court err in allowing the Commonwealth to present the testimony of Susan Brennan, who was not a named witness on the Commonwealth's response to the defendant's bill of particulars, and thus should have been precluded from providing testimony pursuant to Pennsylvania Rule of Criminal Procedure 304?*

"With respect to the discovery of the names of witnesses, there is no requirement that the names of either eyewitnesses or other witnesses be disclosed by the Commonwealth under the mandatory disclosure provisions of Rule 305. See Pa.R.Crim.P. 305(B)(1). Rule 305(B)(2)(a), however, allows for the discretionary discovery of 'the names and addresses of eyewitnesses.' Pa.R.Crim.P. 305(B)(2)(a)." *Commonwealth v. Jones,* 542 Pa. 464, 508, 668 A.2d 491, 512 (1995).

"Even if a witness is called whose name is not in the complaint or bill of particulars, sufficient prejudice must be found to entitle a defendant to reversal. *Commonwealth v. Layman,* 290 Pa. Super. 244, 434 A.2d 735 (1981)." *Commonwealth v. Shirey,* 333 Pa. Super. 85, 149, 481 A.2d 1314, 1348 (1984).

On February 25, 1998, the Commonwealth filed an answer to the defendant's request for a bill of particulars. As part of the answer, the Commonwealth listed the witnesses it expected to call at trial. On May 8, 1998, the Commonwealth filed a motion to amend the witnesses list seeking to call Susan Brennan as a witness. After hearing argument of counsel, this court granted

the Commonwealth's motion. The extent of the witness' testimony was simply a description of the victim's body language when she observed her the day after the incident. The witness' testimony was not directly related to the charges filed against the defendant. The testimony was cumulative in nature at best. The defendant has not demonstrated any significant prejudice based upon the Commonwealth calling this witness.

*(6) Did the trial court err in not allowing testimony by the defendant and/or defense witnesses regarding the physical conduct of the victim towards the defendant, subsequent to allowing the Commonwealth to present the testimony of the same, the morning after the offense allegedly occurred?*

*(7) Did the trial court err in not allowing testimony by the defendant and/or defense witnesses regarding the conversation held by the victim with the defendant the morning after the offense allegedly occurred?*

*(8) Did the trial court err in not allowing testimony by the defendant and/or defense witnesses regarding the physical conduct of the defendant toward relative of the defendant, while the defendant was present along with the victim at HersheyPark Amusement Park, the day after the offense allegedly occurred?*

*(9) Did the trial court err in not allowing testimony by the defendant and/or defense witnesses regarding the act of the victim in seeking help from the defendant when the victim was approached in a threatening manner by other men at HersheyPark Amusement Park the day after the offense allegedly occurred?*

*(10) Did the trial court err in not allowing testimony by the defendant and/or defense witnesses regarding*

*the choice of physical attire in which the victim chose to present herself while at HersheyPark Amusement Park while in the presence of the defendant during the entire day after the offense allegedly occurred?*

In the interest of judicial economy and based upon the similarity of these claims, these issues will be addressed together.

"[J]udges are afforded broad latitude and discretion in determining the admissibility of evidence. Their learned determinations will not be disturbed absent a finding of an abuse of discretion. See *e.g., Commonwealth v. Wharton,* 530 Pa. 127, 145, 607 A.2d 710, 719 (1992); *Commonwealth v. Holloman,* 424 Pa. Super. 73, 78-79, 621 A.2d 1046, 1049 (1993)." *Commonwealth v. Guy,* 454 Pa. Super. 582, 587, 686 A.2d 397, 399-400 (1997).

"At common law, and to some extent even today, a rape victim often suffered secondary abuse at the hands of the judicial system through aggressive defense counsel who 'essentially put the victim on trial.' In response to these abuses, the federal government and the states enacted rape shield laws which 'were intended to end the abuses . . . by limiting the harassing and embarrassing inquiries of defense counsel into irrelevant prior sexual conduct of sexual assault complainants.' *Commonwealth v. Nieves,* 399 Pa. Super. 277, 286, 582 A.2d 341, 346 (1990)." *Commonwealth v. Smith,* 410 Pa. Super. 363, 368, 599 A.2d 1340, 1342 (1991).

The legislature in this Commonwealth recognizing the special problems presented to rape victims that are not presented to any other crime victims, enacted legislation to insure that the focus in a rape trial was

on the defendant's actions and not the victim's actions. That legislation, known as the Rape Shield Law, provides:

*"3104. Evidence of victim's past sexual conduct*

"(a) General rule.—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence." 18 Pa.C.S. §3104(a).

"[T]he purpose of the Rape Shield statute is to prevent a trial from shifting its focus away from the culpability of the accused towards the virtue and chastity of the victim. By so doing, the legislature hoped to end the practice of those defense attorneys who elected to try the victim instead of defend their client." *Commonwealth v. Guy,* 454 Pa. Super. at 587-88, 686 A.2d at 400. "By excluding from trial evidence of the victim's past sexual conduct, the possibility of confusion and prejudice is thus minimized." *Commonwealth v. Wall,* 413 Pa. Super. 599, 611, 606 A.2d 449, 455 (1992). "[T]he Rape Shield Law aids in the fact-finder's search for the truth by excluding evidence which might distract from legitimate issues involved in sexual assault cases." *Id.*

"In addition to the specific exception pertaining to prior consensual intercourse between the accused and the victim delineated in the statute, our courts have

recognized several other instances in which an alleged victim's prior sexual history may be introduced at trial. These exceptions to the general rule have been recognized in an effort to reconcile the effect of the statute in excluding evidence with the accused's Sixth Amendment right to confrontation and cross-examination. Specifically, evidence tending to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution is admissible at trial." *Commonwealth v. Guy,* 454 Pa. Super. 582, 588, 686 A.2d 397, 400 (1996).

"The Rape Shield Law is not meant to prevent the admission of evidence that goes to bias or motive for testifying against the defendant when it might be exculpatory as to the defendant and establish a motive for the victim to color her testimony. The rationale supporting this concept is clearly spelled out as follows in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). 'The Sixth Amendment to the constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas,* 380 U.S. 400, 13 L.Ed.2d 923, 85 S.Ct. 1065 (1965).' *Id.* at 315, 94 S.Ct. at 1110, 39 L.Ed.2d at 353. Specifically, 'an attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudice or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. . . . We *have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-exami-*

*nation.' Id.* at 316-17, 94 S.Ct at 1110, 39 L.Ed.2d at 354." *Commonwealth v. Riley,* 434 Pa. Super. 414, 420, 643 A.2d 1090, 1093 (1994). (emphasis in original)

In this case, the defendant argued that the Rape Shield Law did not apply because the evidence is not evidence of past sexual conduct. In the alternative, the defendant asserted that even if the Rape Shield Law did apply, the evidence is relevant to demonstrate the witnesses' bias, motive or prejudice. The defendant's position is untenable as it is not based on established law. The defendant's position is one successfully held decades ago, but not today.

As the court held in *Commonwealth v. Dickerson,* 2 D.&C.4th 297, 305-306 (1989), *affirmed,* 393 Pa. Super. 634, 564 A.2d 1002 (1989), "defendant's proffered interpretation of section 3104 disregards completely the occasion and necessity for the law, the circumstances under which it was enacted, the mischief to be remedied and the object to be attained. Evidence of the victim's sexual conduct between the date of the attack and the trial is just as embarrassing, just as traumatic and just as abusive as evidence of sexual conduct prior to the attack."

Therefore, this court must review whether the evidence the defendant sought to be included was even relevant.

In this case, the defendant sought to have four witnesses testify concerning the victim's actions the day after the incident. The defendant made an offer of proof regarding each of these witnesses.

Randy Yocum, Jackie Bungarz's brother, would testify that when the victim showed up with the Bungarz

family at Hersheypark Amusement Park, the first thing she did was to lift up her shirt and show him her bellybutton ring. Furthermore, she then took off her t-shirt and wore a string bikini top around the park for the rest of the day.

Lori Yocum, Randy Yocum's wife, would testify similarly to Randy Yocum concerning the bellybutton ring and the victim's clothing.

Jackie Bungarz would testify that during breakfast, the morning after the assault, the victim pulled up her shirt and showed the defendant her bellybutton ring. She would testify that the victim made a "big deal" about the bellybutton ring and how proud she was of it and asked the defendant for his opinion. She would go on to testify that while at HersheyPark, the victim showed Randy and Lisa Yocum the bellybutton ring.

Rheannon would testify that during breakfast, the morning after the assault, the victim pulled up her shirt and showed the defendant her bellybutton ring. She would also testify that at one point during the day, she and the victim were pursued by some boys, and the two girls ran to Jackie Bungarz and the defendant for help.

It should be noted that the defense in this case rigorously cross-examined the victim. Furthermore, the defense called three witnesses, Katy MacBeth, Vanessa Becker and Jennifer Rockhill. These girls testified as to the victim's reputation for truthfulness within the community. Their testimony was that the victim had a reputation for lying. The defense also called Randy Yocum, Lisa Yocum, Jackie Bungarz and Rheannon who testified about the victim's demeanor throughout

the day at the park. The jury was aware that the victim told no one of the attack while she was at the park.

"Although this court also has held that the Rape Shield Law may not be used to exclude relevant evidence attacking credibility or showing a witness' bias, *Commonwealth v. Black,* 337 Pa. Super. 548, 487 A.2d 396 (1985), subsequent decisions have applied the holding in *Black* quite narrowly, and 'only where the victim's credibility was allegedly affected by bias against or hostility toward the defendant, or the victim had a motive to seek retribution.' *Commonwealth v. Boyles,* 407 Pa. Super. 343, 354, 595 A.2d 1180, 1186 (1991)." *Commonwealth v. Gaddis,* 432 Pa. Super. 523, 531, 639 A.2d 462, 466 (1994).

In considering that evidence, this court shall proceed to review the applicable case law. "Our initial inquiry is to determine whether the proffered evidence is relevant to appellee's defense at trial." *Commonwealth v. Fernsler,* 715 A.2d 435, 440 (Pa. Super. 1998). "Evidence is relevant if it logically tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Wall,* 413 Pa. Super. 599, 616, 606 A.2d 449, 458 (1992). "As applied to the Rape Shield Law, relevant evidence is that which may tend to directly exculpate the accused by showing . . . bias, hostility, motive to lie or fabricate." *Commonwealth v. Guy,* 454 Pa. Super. 582, 590, 686 A.2d 397, 401 (1996).

In *Commonwealth v. Killen,* 545 Pa. 127, 680 A.2d 851 (1996), "in order to attack the complainant's credi-

bility, [the defendant] sought to introduce evidence of certain sexually provocative statements which the complainant allegedly made to a fireman (Larndo Hedrick) who rode with her to the medical center in the ambulance and to the emergency room physician, Dr. Martin." *Id.* at 130, 680 A.2d at 853. (footnote omitted) The defendant "asserted as his defense that the complainant was the aggressor, that [defendant] rejected her advances and that she ultimately fabricated the charges against the [defendant] in retaliation for his departure. [The defendant] contends that evidence of the complainant's similar overtures to Hedrick (approximately five minutes after she admits she falsely told her neighbor appellant had raped her) and to Dr. Martin at the hospital corroborated appellant's theory that the complainant was the aggressor, as opposed to appellant, and that she had fabricated the criminal nature of the incident." *Id.* at 131-32, 680 A.2d at 853.

The Pennsylvania Supreme Court held: "the proffered testimony in the case sub judice does not reference in any way the complainant's past sexual conduct as proscribed by section 3104(a); rather, the statement evidences the complainant's state of mind shortly after (and by implication during) her alleged sexual assault and is therefore relevant and admissible to impeach her credibility. The Rape Shield Law was not designed to exclude evidence of a victim's statements to persons which are part of and relevant to the ongoing episode in which the alleged criminal activity takes place. The fact that the statements are sexually provocative in content does not automatically bring them within the protective purview of the Rape Shield Law." *Id.* at 133, 680 A.2d at 854.

In the case at bar, unlike *Killen,* the evidence was not being offered as proof of defendant's theory of defense and it was not evidence of the victim's state of mind shortly after the incident. In *Killen,* the victim made statements shortly after she was sexually assaulted. The victim here did not make any such statements. The defendant is seeking to introduce circumstantial evidence of what the victim, a 15-year-old girl, wore on a summer's day at HersheyPark Amusement Park and stretch the law to imply that it went to her state of mind. The same argument is presented regarding the 15-year-old victim's showing of her bellybutton ring.

The Supreme Court in *Killen* pointed out that the statements of the victim were part of the ongoing episode. It is uncontroverted that the evidence the defendant is seeking to admit did not occur shortly after the incident but occurred after an extended period of time. The evidence in *Killen* was introduced to prove that the complainant was the aggressor, that defendant rejected her advances and that she ultimately fabricated the charges against the defendant in retaliation for his departure. Here, while the defendant has asserted his innocence and claimed that the victim's story was fabricated, no such defense was asserted.

Furthermore, it should be noted that the choice of physical attire by the victim was not as controversial as the defendant may lead one to believe. The victim was going to an amusement park on a summer day. On any given day, one can walk through amusement parks and observe many young men and women walking around in bathing suit-type attire.

These same arguments were made 20 years ago about high heels and short skirts. Today the trend among

young people is tattooing and body piercing. What do they have in common? They are not relevant to the issue presented to this court.

Following the defendant's logic, a man in an Armani suit walking in a desolate "high crime area" of a city, who is mugged and robbed, would have no right to file charges because he "asked for it." That was an illogical and dangerous argument 20 years ago and is an illogical and dangerous argument now. Dangerous? Yes, for whenever the system of justice is not seen as fair and objective or when it demonstrates a perceived bias, the system itself suffers permanent damage. Part of the legislative history behind the Rape Shield Law was to restore common sense to a system that had diverted the focus from the defendant to the victim.

This court will not subvert the law because it may be the "politically correct" thing to do. The purpose of the Rape Shield Law was to prevent such abuses from the system notorious for its treatment of rape victims. The defendant was provided with a fair trial. The jury found him guilty. This court respectfully urges the appellate court to recognize the validity of that process and dismiss this appeal.

*(12) Did the trial court err in not granting the defendant's various motions for extraordinary relief prior to sentencing?*

On August 27, 1998, prior to the defendant's sentencing hearing, defense counsel orally submitted a motion for arrest of judgment or judgment of acquittal for a new trial, objection to Megan's Law should it be found to be unconstitutional, and a motion for a new trial. This court summarily denied each motion prior to sentencing.

For all of these reasons, this court respectfully requests that the defendant's appeal be denied.